## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

| | | |
|---|---|---|
| Akouvi Adjessom, as Administratrix of the Estate of Randall Adjessom, deceased, | : : : | |
| Plaintiff, | : : | JURY TRIAL DEMANDED |
| | : | Civil Action No.: |
| v. | : : | |
| City of Mobile and John Doe Mobile Police Officers 1-20 | : : : | |
| Defendants. | : : | |

## COMPLAINT

Plaintiff, Akouvi Adjessom ("Plaintiff"), individually and as administratrix of the Estate of Randall Adjessom ("Randall"), deceased, by and through her attorneys, Grant & Eisenhofer, P.A., asserts the following complaint against Defendants the City of Mobile ("the City"), John Doe Mobile Police Officer 1, and John Doe Mobile Police Officers 2-20 (collectively "John Does 2-20"), individually as police officers for the Mobile Police Department (John Doe Mobile Police Officer 1 and John Does 2-20 are collectively referred to as the "Police Officer Defendants") and in support thereof, avers as follows:

## INTRODUCTION

1.      On November 13, 2023, members of the Mobile Police Department ("MPD") Special Weapons and Tactic unit ("SWAT") fired four shots at Randall Adjessum ("Randall"), a 16-year-old black child, during the course of an improper and unnecessary predawn raid being effectuated at Randall's family home at 3408 Sheringham Drive, Mobile, Alabama ("the Sheringham Residence"), striking Randall. After shooting the child, Police Officer Defendants, all members of MPD's SWAT, stepped over Randall's writhing body and stated, "what are we going

to do with this." Police Officer Defendants then waited over four (4) minutes to render Randall any aid whatsoever and over forty (40) minutes to get him to the nearest hospital. As a result of Police Officer Defendants' shooting of the minor and their failure to render him timely aid, Randall died. Although Police Officer Defendants were holding Randall's mother, grandmother, aunt, and sisters in a room just feet from where 16-year-old Randall lay—without any cause to do so—Police Officer Defendants never told his family that they had shot the child or that he was bleeding out in the hallway outside his bedroom door. As a result, Randall's family, including Plaintiff, had no opportunity to render Randall aid, take him to a hospital, or call an ambulance; they also had no opportunity to say goodbye to their son, grandson, nephew, and brother.

2.     As detailed in this Complaint, Randall's death was both preventable and foreseeable. First, Defendants raided Randall's home to effectuate a search warrant, which was looking for marijuana purportedly possessed by Randall's older brother. However, Randall's adult brother did not reside at the Sheringham Residence and was not present at the Sheringham Residence at the time of the raid; facts that Defendants knew or should have known prior to entry. Despite this knowledge, Police Officer Defendants forced entry into the Sheringham Residence before sunrise. Police Officer Defendants did not announce themselves prior to entry. Instead, they yelled "police" one time as they rammed down the home's front door and broke a separate window in the home's living room. Within seconds of their entry, Randall, who had been asleep, exited his bedroom with a firearm to protect his mother, grandmother, aunt, and sisters from the unknown intruders breaching his childhood home. Randall's actions in protecting his home were imminently foreseeable given Alabama's codification of the Castle Doctrine, Title 13A-2-23, which permits the use of lethal force in defense of one's dwelling. As Randall rounded the corner into the hallway, he saw that the intruders were police and immediately put his hands in the air and took a step

backwards towards his bedroom. While Randall was in the process of retreating, and despite the fact that he had not made any verbal threats or attempted to fire the weapon, John Doe Mobile Police Officer 1 shot Randall four times through the abdomen and torso. Randall immediately fell to the ground, writhing from the pain and shock of being shot multiple times. At the time that Police Officer Defendants gunned Randall down, he had not committed any crime, made any verbal threats, or resisted or evaded arrest; he was retreating from their intrusion.

3.      After shooting him, Police Officer Defendants did not render any aid to Randall or speak to the child for another four (4) minutes. They simply stepped over his body to clear Randall's bedroom and an empty bedroom across the hall. Obviously, Police Officer Defendants did not believe the dying child to be a threat, as evidenced by the fact that they did not take the gun away from his hand. Then, Police Officer Defendants offered only minimal aid to Randall in the form of mere wound dressing for the next forty (40) minutes, which they admitted to one another was insufficient to keep him alive.

4.      The hospital was only 8 minutes away, but Police Officer Defendants did not see that Randall was taken there promptly and, upon information and belief, delayed in calling for emergency medical services and/or prevented emergency services from reaching Randall. During this 40-minute period and for hours after it, Randall's mother (Plaintiff), grandmother, aunt, and minor sisters remained forcibly detained in the living room of the Sheringham Residence. Police Officer Defendants never told Randall's family that they had shot the child. Plaintiff, who was among those detained, learned hours later that Randall, her son, had been killed hours earlier when Defendant Police Officers took her to the local police station for questioning and showed her a picture of her son dead or dying in the hospital. Although she was only a few feet from Randall

when he lay bleeding out in the hallway, Police Officer Defendants never let her see her child prior to his death.

5.      Randall was not a named target of the search warrant and was not suspected of any wrongdoing. Instead, as explained throughout this Complaint, Randall was a victim of systemic failures and deliberate indifference by the City and its policy-makers, like Mayor Stimpson and Chief Prine, which led to this dangerous, unjustified, and fatal raid by the Police Officer Defendants. MPD's lack of adequate manpower, proper threat assessment, training, supervision, discipline, weapon maintenance, as well as its known failure to formulate and adhere to acceptable policies, customs, and/or practices with respect to search warrant surveillance and execution, led directly to the child's tragic and unjustified death. As explained herein, Defendants were aware of MPD's and Police Officer Defendants' wide-spread pattern and persistent practice of committing similar incidents, their recent series of unnecessary and foreseeable deaths involving young black men, and their inability to de-escalate altercations with black suspects.  Despite this knowledge, they failed to institute proper training, supervision, and discipline protocols within Mobile PD and Mobile SWAT. These failures should have placed the City, Mayor Stimpson, and Chief Prine on notice of the need to adequately train, supervise, and discipline its police officers to minimize the obvious risk posed to human life through the execution of search warrants prior to Randall's death and serve to demonstrate Defendants' deliberate indifference to the lives of Mobile's citizens. Rather than adequately train, supervise, and discipline MPD police officers prior to Randall's death, the City created and fostered an environment within the MPD where the death of an uninvolved person, like 16-year-old Randall, was not only foreseeable, but almost certain to occur. This attitude of deliberate indifference was directly expressed by MPD Chief Prine, who, soon after being promoted to chief of police in 2021, reportedly told MPD officers, including the

Defendant Police Officers, "I'm not concerned with what the media and public thinks about the police. Fuck the public."

6.      Chief Prine's comments, which were apparently echoed for months by other MPD officers, evince the Department's long-standing disdain for Mobile's residents, like Randall and his family. According to an Independent Investigation and subsequent Report by former U.S. Attorney Keynan Brown ("the Independent Investigation" or "the Brown Report"), an unnamed MPD police officer in a leadership position (Officer #1) reported that MPD officers would routinely say, "According to the chief, fuck the public!"[1] Officer #1 thought that "Chief Prine's comments adversely impacted the way some officers may police in the future." Yet, the City and Mayor Stimpson failed to take any action to further train, supervise, or discipline Chief Prine and likewise failed to take any action to further train, supervise, or discipline Police Officer Defendants who adhered to his philosophy.

7.      The adverse impact of Chief Prine's comments and the deliberate indifference promulgated by Chief Prine, Mayor Stimpson, and the City was evident during MPD's planning and execution of the predawn raid on the Sheringham Residence. Police Officer Defendants shot Randall even though he was not actively resisting officers' actions and left the child to bleed to death without providing Randall with or seeing that he received adequate and timely medical attention for approximately forty minutes. At the same time, Police Officer Defendants intentionally withheld the fact that they had killed Randall from his family, along with the reason for the raid.

8.      As set forth more fully herein, Defendants engaged in an egregious course of action that deprived Randall of the right to be free from excessive force and/or deprived him of his

---

[1] *See* The Brown Report (Redacted), at p. 80, Section VII, Subsection (a.), a true and correct copy is attached hereto as **Exhibit A**.

substantive due process right to life, and thus violated clearly established Fourth and/or Fourteenth Amendment rights under the United States Constitution. The City was on notice regarding MPD's wide-spread pattern and practice of committing constitutional violations during the course of raids and in the apprehension of suspects, especially black suspects. Despite this knowledge, the City failed to take necessary action to further train, supervise, and discipline MPD's police officers who committed prior known policy violations. Their failures directly resulted in the Police Officer Defendants' shooting and killing of a 16-year old child during the execution of a needless, pre-dawn marijuana raid at the Sheringham Residence.

## PARTIES

9.      Plaintiff Akouvi Adjessom is the parent and natural guardian of 16-year-old Randall Adjessom, deceased, and was issued Letters Testamentary to serve as Administratrix of his Estate on January 30, 2024.  *See* Letters Testamentary, attached hereto as **Ex. "B"**.

10.      Plaintiff is and was at all material times a resident of Mobile, Alabama.

11.      Plaintiff timely filed Notices of Claim with the City that concerns the incident and claims set forth in this Complaint on April 2. 2024 and May 10, 2024. *See* Notices of Claim, collectively attached hereto as **Ex. "C"**.

12.      Plaintiff brings the claims set forth in this Complaint on behalf of the Estate of Randall Adjessom, its beneficiaries and, individually, in her own right as Randall's mother and statutory next-of-kin.

13.      Defendant City of Mobile is a municipality of the State of Alabama and a governmental authority that owns, operates, manages, directs, and controls the Mobile Police Department, which employed the Police Officer Defendants.

14.      Defendant John Doe Mobile Police Officer 1 is a fictitiously named Defendant who was at all times relevant to this action a police officer of the Mobile Police Department and

participated in the planning, supervision, and/or execution of the predawn raid that caused the unconstitutional death of Randall.

15.     The true name and identity of Defendant John Doe Mobile Police Officer 1 is known to Defendant City of Mobile, but has been shielded and withheld from Plaintiff and the general public by Defendant City of Mobile. Plaintiff intends to amend this Complaint to include his name and identity when same are ascertained.

16.     Defendant John Doe Mobile Police Officer 1 is being sued in his individual capacity as a police officer for the City of Mobile.

17.     Defendants John Doe Mobile Police Officers 2-20 are fictitiously named Defendants who were at all times relevant to this action police officers, supervisors, and/or policymakers of the Mobile Police Department and participated in the training, policymaking, planning, supervision, and/or execution of and/or related to the predawn raid that caused the death of Randall.

18.     The true names and identities of Defendants John Doe Mobile Police Officers 2-20 are known to Defendant City of Mobile, but have been shielded and withheld from Plaintiff and the general public by Defendant City of Mobile. Plaintiff intends to amend this Complaint to include their names and identities when same are ascertained.

19.     Defendants John Doe Mobile Police Officers 2-20 are being sued in their individual capacities as police officers for the City of Mobile.

## JURISDICTION AND VENUE

20.     This action is brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343.  Plaintiff further invokes the supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear and decide claims under state law.

7

21.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this Complaint occurred in this judicial district.

## FACTUAL ALLEGATIONS

**THE MOBILE POLICE DEPARTMENT'S IMPROPER DECISION TO USE SWAT TO PERFORM A PREDAWN RAID AT THE SHERINGHAM RESIDENCE**

22.     At all relevant times prior to and on November 13, 2023, Randall resided at the Sheringham Residence with Plaintiff, his two minor sisters, his older sister, his aunt, and his grandmother.

23.     The MPD first became interested in the Sheringham Residence in the days prior to November 13, 2023, when officers allegedly received a citizen's complaint concerning suspected drug activity at the location.

24.     The alleged citizen's complaint related to Randall's 18-year-old brother, Deangelo Adjessom ("Deangelo"), who thereafter became a suspect of an MPD Narcotics Unit investigation.

25.     Randall, a 16-year-old minor, was not a subject of the investigation and was not suspected of engaging in any criminal activity. At all relevant times, Deangelo, an adult and the target of the investigation, did not reside at the Sheringham Residence.

26.     On or about November 9, 2023, as a part of the then ongoing narcotics investigation, the MPD initiated a traffic stop on Deangelo and discovered a small amount of marijuana, a firearm, and what it considered to be evidence of intent to distribute marijuana.

27.     Deangelo cooperated during the traffic stop. He also waived his Miranda rights and agreed to be interviewed.

28.     Despite having evidence in hand that would have permitted MPD officers to effectuate the arrest of Deangelo, MPD released him.

29.     MPD then prepared a search warrant of the Sheringham Residence, even though Deangelo was not living at the Sheringham Residence at that time, which a judge executed on November 9, 2023, at approximately 8:17pm.

30.     The sworn Search Affidavit prepared by MPD officers for that warrant stated that that police received information from neighbors of drug activity at the Sheringham Residence. It also stated that police found marijuana, evidence of distribution, and a firearm on Deangelo during a recent traffic stop. The Search Affidavit does not mention Randall as being suspected of committing criminal activity.

31.     The Search Affidavit did not state why Deangelo was not detained during the earlier traffic stop or why MPD did not obtain a warrant for the Sheringham Residence during that detainment.

32.     The Search Affidavit also did not articulate any facts evidencing the need for a nighttime pre-dawn raid.

33.     At the time the warrant was sought, MPD did not have reasonable grounds to believe that knocking and announcing its presence would create an imminent threat of physical violence to the officers or to another person.

34.     MPD likewise did not have reasonable grounds to believe that execution of the warrant during daylight hours would create an imminent threat of physical violence to officers or to another person.

35.     Consequently, MPD did not seek judicial authorization for a no-knock entry; MPD did not obtain supervisory approval for a no-knock entry; and MPD did not obtain felony-level prosecutor's office approval for the same.

36.     To be clear, the subsequent warrant executed by the Court did not authorize pre-dawn, no-knock execution of the warrant.

37.     Prior to executing the warrant on the home, an MPD Narcotics Unit police officer completed the MPD's Threat Assessment for Warrant Service form ("Threat Assessment"), which is used to measure the risk of violence the executing officers could potentially face.

38.     The Threat Assessment score was eight out of ten, which made the use of MPD SWAT "optional."

39.     Importantly, in cases where a SWAT detail is activated to participate in the execution of a search warrant, a parallel risk assessment evaluating the risk of injury or death to citizens and/or innocent bystanders is not required by the MPD.

40.     MPD's failure to evaluate the civilian risk is not an oversight on the part of the department, but is, in fact, intentional. There is one question on the Threat Assessment form that reads, "Are there children, elderly persons, or handicapped persons? [Inside the location to be searched]." However, although that question is contained on the form, the phrase "Informational purposes only" appears in parentheticals below this question and the columns next to the question where a response could be provided are permanently shaded out on the form.

41.     Although entry of the information is permanently shaded on the form, it is clear that MPD either knew or should have known that there were multiple children and elderly persons in the Sheringham Residence prior to execution of the warrant.

42.     Prior to the raid, MPD purportedly conducted surveillance over the course of "several weeks" on the home. Because MDP conducted surveillance over the course of "several weeks," it would have seen that Randall, a child, lived there with other children as well as his adult female family members.

43.     MPD did not indicate the number of children and elderly persons in the home in its Search Affidavit.

44.     Following MPD's inadequate and incorrect threat assessment and receipt of Court-executed search warrant, the Narcotics Unit decided to engage SWAT to execute the search warrant apparently because of officer shortages in the MPD and planned for SWAT to execute a predawn raid on the Sheringham Residence.

45.     At no point during the course of the Narcotics Unit's investigation and subsequent raid planning was the sanctity of life prioritized by the MPD.  Specifically, the Threat Assessment conducted by the MPD intentionally failed to evaluate the risks to citizens posed by a SWAT raid and specifically failed to consider the known minor and elderly occupants of the Sheringham Residence.

46.     Moreover, at no point during MPD's assessment were the risks to citizens posed by a predawn raid considered by MPD.

47.     MPD decided to effectuate a predawn raid for suspected marijuana sales despite the fact that MPD knew that the execution of a predawn raid posed a unique and heighted risk to citizens, as police will encounter individuals who are asleep at the time of the raid and who will wake up in a state of confusion and panic upon hearing banging, yelling, and the breaking down of doors at their home.

48.     Further, the MPD decided to effectuate the instant predawn raid knowing that individuals caught in the midst of a predawn raid were likely to believe that someone is breaking into their home, and consequently grab a weapon to protect themselves and their families. In fact, given Alabama's codification of the Castle Doctrine, citizens' protection of their home through

the use of deadly force in response to a break-in would be justified, rendering it all the more foreseeable.

49.     Here, either (1) MPD did know, by virtue of its surveillance efforts, that minors and elderly persons lived at the Sheringham Residence and failed to consider the extreme risk to their lives the predawn raid posed; or (2) as MPD Internal Affairs later concluded, had MPD conducted a more thorough investigation into the Sheringham Residence before completing the Threat Assessment and executing the search warrant, the officers would have known that there were children present in the household, including Randall, and could have formulated a safer approach, such as conducting the approach during school hours. Under either scenario, MPD failed to act reasonably and deviated from industry standard.

50.     MPD's failure to gather and/or disseminate information regarding the occupants of the Sheringham Residence resulted the omission of vital information from the Threat Assessment and the search warrant that would have precluded the use of SWAT and warranted an alternative form of search warrant execution.

### MPD'S KILLING OF 16-YEAR-OLD RANDALL ADJESSOM

51.     On November 13, 2023, at approximately at 5:37 a.m., MPD's SWAT, comprised of the Defendant Police Officers, began the predawn raid to execute the search warrant of the Sheringham Residence.

52.     Sunrise was not until 6:16 a.m. that day, meaning that the warrant was _not_ executed during daylight hours despite the fact that Defendant Police Officers did not obtain authorization from the Court for a nighttime pre-dawn raid.

53.    At approximately 5:38:41 a.m., as seen on body worn camera (hereinafter referred to as "BWC") video footage, Defendant Police Officers approached the Sheringham Residence from several different locations.

54.    After surrounding the home, at approximately 5:39:13, Defendant Police Officers approach the front door of the residence with a battering ram and proceeded to break down the front door and at least one window in the living room of the home.

55.    At 5:39:51 a.m., Defendant Police Officers tactically entered the front door of the premises in formation, yelling "police" for the first time, either as they entered or shortly thereafter.

56.    Defendant Police Officers' failure to knock and announce their presence prior to breaching the home (and their subsequent failure to provide a reasonable response time from the home's occupants), violated industry standards and federal law.

57.    Randall, asleep in his childhood bedroom, would have heard the home he shared with his mom, sisters, aunt, and elderly grandmother being breached from all sides by a seemingly large number of attackers.

58.    Within seconds of breaking into the Sheringham Residence, SWAT officers reached an intersection at the end of the front hallway just a few feet from the front door when Randall appeared from around a corner coming from the direction of his bedroom. Justifiably believing that he and his family were under attack by a large number of individuals, Randall was holding a laser-guided weapon in his hand, in defense of the Sheringham Residence and his family. Prior to realizing who was breaking in his home, Randall held the gun and sight pointed forward.

59.    BWC video footage shows the moment when Randall rounds the corner and sees that his attackers are actually police officers.

60.     Upon this realization, Randall immediately began to raise his hands (including the firearm in his hand) and step back away from the officers. His retreat caused the laser sight on the firearm to move from pointing in front of him at the police officers to the wall. Randall never attempted to fire the weapon at anyone.

61.     BWC footage shows the Police Officer Defendants' vantage point. From this footage, it is clear that Police Officer Defendants would have seen Randall putting his hands up and taking a step backwards in retreat.

62.     As Randall was starting to raise his hands and retreat, an MPD SWAT officer attempted to fire his weapon, but the weapon malfunctioned — a known issue with MPD's firearms — and the officer fell to the ground. Despite having the opportunity to do so, none of Defendant Police Officers called for their fellow officers to hold fire as Randall retreated.

63.     Instead, at 5:40:02, approximately 11 seconds after SWAT forced entry into the Sheringham Residence, Defendant John Doe Officer 1 shot Randall four (4) times in the chest and torso.

64.     Defendant John Doe Officer 1 shot Randall while Randall's hands were in the air and he was actively retreating from the officers, and thus while he posed no danger to MPD police officers or anyone else.

65.     After Defendant John Doe Officer 1 shot Randall four (4) times, Randall fell to the ground with grave injuries; BWC reveals that his body writhed with the pain from his injuries, but Defendant Police Officers did not immediately render medical aid.

66.     Instead, at 5:40:30, a SWAT officer can be heard on BWC stating, "What are we going to do with this?", apparently referring to the dying black child they had just shot as "this."

67.    Rather than call for or render aid, Defendant Police Officers unnecessarily and improperly devoted the entirety of the large officer presence on site to securing the Sheringham Residence, which consisted of detaining Plaintiff and Randall's other family members by placing them into a room at the front of the Sheringham Residence's first floor. Defendant Police Officers never informed Randall's family that they had shot Randall and, because of that fact and their respective locations within the Sheringham Residence, Randall's family had no idea that he had been shot. Plaintiff believed that he must have stayed at a friend's house overnight and that was the reason for his absence from the front room.

68.    As Defendant Police Officers were detaining Randall's family in the front room, Randall was writhing on the floor in pain, actively bleeding to death. Defendant Police Officers can be seen on a BWC stepping over his body instead of bending down to comfort or care for him.

69.    More than four minutes after Randall was shot by Defendant John Doe Mobile Police Officer 1, at approximately 5:44:18 a.m., well after Defendant Police Officers knew the site was secure, a SWAT officer can be seen on a BWC beginning to place bandages on Randall, but upon information and belief, that SWAT officer already knew that these efforts were insufficient to treat multiple gunshot wounds, which were causing profuse bleeding and systemic shock. At this point, Randall is seen on BWC not moving and appearing limp.

70.    By 5:50 a.m., the SWAT officer that placed bandages on Randall can be heard on BWC stating, "he needs to go somewhere else without just me." At 5:51 a.m., a Defendant Police Officer remarks that Randall was still breathing. The BWC makes clear that Randall was still alive and suffering after the shooting and that timely medical aid was not rendered to Randall despite the obvious need for same.

71.     Upon information and belief, prior to and at this point, no efforts had been made to alert emergency medical services of the need to retrieve Randall, a gunshot victim with serious medical needs, despite Defendant Police Officers' knowledge of his serious medical needs.

72.     Medical records confirm that Randall was not admitted to a local emergency room until 6:28 a.m.—50 minutes after Police Officer Defendants shot him, where he was pronounced dead.

73.     The local hospital is only 8 minutes from the Sheringham Residence.

74.     Therefore, either (1) Defendant Police Officers delayed in calling for emergency medical services, which they knew he needed; or (2) they called but then prevented the same from accessing the Sheringham Residence to retrieve Randall's body.

75.     Under either scenario, Defendant Police Officers were deliberately indifferent to Randall's serious medical needs.

76.     Upon information and belief, had Defendant Police Officers timely contacted EMS and/or allowed EMS to take Randall to the ER, Randall's death could have been prevented.

77.     Defendant Police Officers' use of force and failure to render timely aid both violate the City's use of force policy, which is outlined in MPD's General Order No. 1 and states as follows:

### 1.3.2 AUTHORIZED USE OF A DEADLY FORCE:

**Definitions**

Deadly Force – That level of force which a reasonable and prudent person would consider likely to cause death or great bodily harm.

Probable Cause – A state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain honest and strong suspicions that a person sought to be arrested is guilty of a crime.

<u>Reasonable Probability</u> – The facts or circumstances the officer knows, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.

<u>Serious Physical Injury</u> – A bodily injury that creates a substantial risk of death, causes serious permanent disfigurement, or results in long-term loss or impairment of the functioning of any bodily member or organ.

The following **conditions** must be met to justify the use of deadly force:
A. The officer has probable cause to believe any of the following:

1. The subject possesses a weapon or is attempting to gain access to a weapon under circumstances indicating an intention to use it against the officer or someone else; or

2. There exists a reasonable probability of further death or injury if a violent felon is not apprehended and the officer has exhausted all other reasonable means of apprehension; or

3. A subject with the capability of inflicting death or serious injury – or otherwise incapacitating the officer – without a deadly weapon is demonstrating an intention to do so; or

4. The subject is attempting to escape from the vicinity of a violent confrontation in which he inflicted or attempted the infliction of death or serious physical injury.

B. Application of Deadly Force:

1. When circumstances permit, a verbal warning of the intent to use deadly force shall be given.

2. When the decision is made to use deadly force, officers may continue its application until the subject surrenders or no longer poses an imminent danger.

3. When deadly force is permissible under this policy, attempts to shoot to cause minor injury are unrealistic and can prove dangerous to officers and others because they are unlikely to achieve the intended purpose of bringing an imminent danger to a timely halt.

4. Even when deadly force is permissible, officers should assess whether its use creates a danger to third parties that outweighs the benefit of its use.

5. When deadly force is used, appropriate medical aid shall be rendered, as is deemed safely possible, while awaiting the arrival of Emergency Medical Technicians.

*See* Brown Report, at pp. 12-13, Section IV, Subsection (B), (**Ex. A**) (emphasis in original).

78.     Defendant Police Officers, including and specifically Defendant John Doe Mobile Police Officer 1, knew that Randall raised his hands and was retreating from officers when he decided to fire his weapon four (4) times at the child, and therefore knew that the use of deadly force could not be justified on a retreating suspect that posed no threat to police officers or anyone else.

79.     Defendant Police Officers knew that they had a duty to intervene to prevent constitutional violations, such as the use of excessive force, on the part of their fellow police officers, but willingly failed to act to prevent Defendant John Doe Mobile Police Officer 1 from using deadly force after the initial malfunction of another Defendant Police Officer's weapon.

80.     Defendant Police Officers knew that they had a duty to render timely medical aid to Randall and/or to intervene to ensure that timely medical aid was rendered to Randall, and, in violation of the MPD's Use of Force Policy, delayed medical aid so that they could attempt to conceal their unconstitutional use of force on Randall.

81.     During the entirety of the raid, a period that ultimately stretched into the afternoon, Randall's family, including Plaintiff, remained detained in the Sheringham Residence while Defendant Police Officers continued to blatantly disregard constitutional rights.

82.     Specifically, during this period, as Defendant Police Officers were attempting to search for evidence of a crime to pin on Deangelo or Randall, they searched Randall's cellular telephone absent consent or a search warrant enabling them to do so.

83.     Upon information and belief, Defendant Police Officers' actions were undertaken as part of an attempt to portray the now deceased 16-year-old Randall as a criminal, and thus provide an after-the-fact justification for his unconstitutional killing.

84.     While Defendant Police Officers were actively attempting to conceal their wrongdoing, Randall's family remained unnecessarily detained in the Sheringham Residence and unaware of his death. In fact, Plaintiff was not informed that Randall, her son, had been shot and killed until the evening of November 13, 2023, when she was taken to a local police station and informed of her son's tragic, wholly avoidable, and constitutionally violative death. During the entire time that Randall remained inside the Sheringham Residence bleeding to death, MPD did not inform Plaintiff that her son lay dying a few feet from where she was being held. Plaintiff did not know that her youngest boy needed immediate medical aid and therefore could not ensure that her child received emergent care.

**THE AFTERMATH OF RANDALL'S DEATH**

**A.     Community Outrage, a Temporary Ban on Predawn Raids, and the City's Failure to Enact Permanent Change**

85.     Community outrage quickly followed in the aftermath of Randall's death, which was among four highly questionable and fatal uses of force by the MPD in an eight-month period.

86.     In response, the City placed Defendant John Doe Mobile Police Officer 1, who shot and killed Randall, on administrative leave.

87.     A statement from Mobile Mayor Sandy Stimpson, who was at all relevant times the Mayor of Mobile Alabama and a chief policy-maker of the MPD, expressed his condolences to

Randall's family and further noted, "I have unanswered questions about the events leading up to this tragic outcome, and I am taking immediate steps to get those answers."

88.    Mayor Stimpson immediately instituted a temporary, 90-day ban, on all predawn warrants absent an immediate threat to life, and the Mayor requested that Kenyen Brown review the MPD's policy, procedures and training related to officers' use of force.

89.    Similarly, at a press conference with members of the media, Chief Prine, who was at all relevant times the Chief of Police for the MPD and a chief policy-maker of the MPD, acknowledged the danger predawn raids pose to the public, "[t]he question will always be and certainly understandable as to whether or not, you know, the individuals or the occupants of the home knew it was the police."

90.    Upon information and belief, Mayor Stimpson and Chief Prine's comments, as well as the Mayor's decision to institute the temporary ban on predawn raids absent exceptional circumstances, were due to the City's knowledge of and, up to that point, deliberate indifference to, similar past deadly incidents involving predawn raids and the use of excessive force by the MPD and its SWAT, as well as the continuing risk posed to the public absent immediate action to address deficient policies, practices, customs, training, supervision and/or discipline within the MPD.

91.    In fact, Mayor Stimpson and Chief Prine knew that just months prior, on March 7, 2023, MPD had shot and killed Kordell Jones, a 24-year old black man, in a pre-dawn raid on Kordell's home, which occurred under strikingly similar circumstances to Randall's death. In that prior incident, MPD's SWAT broke into the Jones' family home using a battering ram and explosives to execute a warrant on Kordell's brother. Kordell was not suspected of committing any crime. But Kordell, awoken to the sounds of his family residence (which also included at least

one child) being broken into, grabbed a firearm and then attempted to escape out of a window. Police shot Kordell approximately four times as he came out of the window, before he even hit the ground. He did not threaten the MPD with the firearm. He had not committed any criminal activity.

92.    The City's deliberate indifference to the death of black men and children like Kordell and Randall during pre-dawn, no-knock, execution of warrants is exemplified through their statements and actions after Kordell's shooting. Chief Prine, consistent with his "fuck the public" mentality, placed blame on Kordell's brother for MPD's killing of Kordell, instead of his officers who had clearly violated the aforementioned Use of Force policy, claiming that the shooting is an example of how criminal activity can impact the families of the criminal.

93.    The City and Mayor Stimpson took a different approach – placating the public with faux outrage at the situation while, simultaneously, likewise failing to retrain, supervise, or discipline the MPD officers who committed policy violations.

94.    After the shooting, James Barber, Mayor Stimpson's Chief of Staff acknowledged that "no knock search warrants are a danger to people in the residences and officer safety," but said a ban could *not* be instituted because "it's a law that is through the state and not through the city counsel."

95.    Nevertheless, Mayor Stimpson's office stated that "it's our position that administratively, we will not execute no knock warrants. You have my assurance of that as long as I'm here, we will not do that," claimed Barber. Of course Barber's claims on behalf of the City were meaningless given that mere months later MPD broke into the Sheringham Residence yelling "police" only as they were entering the residence, conduct which amounts to the no-knock execution of a warrant without prior authorization to engage in same.

96.    After Randall's death, perhaps upon the realization that lawsuits on behalf of the multiple slain persons killed by MPD were impending, Mobile's City Council began to take steps, at least publicly, to formally codify and make permanent a restriction on predawn raids through a proposed City ordinance.

97.    But even though a child had now been killed, the City's efforts proved still to be a mere show to the public of proposed reform, which the City and MPD did not intend to actually enact.

98.    In fact, despite the recognition of the danger posed by predawn raids, the MPD, through its highest-ranking officer, Chief Prine, began to resist the call for permanent reform.

99.    According to Chief Prine, the proposed ordinance was unnecessary because the MPD had already reached a mutual understanding with the City's council about predawn raids. Obviously that mutual understanding, which had come—according to Stimpson's office after Kordell's death—failed to effectuate any meaningful change prior to Randall's killing.

100.    Upon information and belief, the MPD's opposition was, and remains, part of an ongoing custom or practice by the MPD to avoid oversight and accountability with respect to the improper predawn raids, to avoid the reform of training, supervision, and discipline practices with respect to same, to conceal the extent of the MPD's staffing, equipment and tactical deficiencies, and to conceal the routine use of excessive force by SWAT.

101.    To date, due to MPD's opposition, efforts to impose a ban on predawn raids through City ordinance have been unsuccessful and their use by the MPD remains permissible even though the risk of death to innocent citizens, like 16-year-old Randall, clearly outweighs the benefit of these extremely dangerous raids.

**B.     The Brown Report Took Steps to Lay the Groundwork for Municipal/*Monell* Liability Against the City of Mobile but Ultimately Concealed Some of the Most Damning Facts against MPD**

102.    The Brown Report was commissioned and paid for by the City.

103.    Upon information and belief, the Brown Report's purpose was not to bring about systemic change in the City and MPD, or even to fully address the failings its author identified, but rather to placate a community outraged by a series of controversial deaths brought about by the MPD, including the unconstitutional killing of Randall, an innocent child.

104.    Upon being published to the public, the Brown Report was heavily redacted.

105.    Upon information and belief, these redactions were meant to keep the public from knowing the extent of the City's unconstitutional *de facto* policies, practices and/or customs, as well as the extent of police officer misconduct, and, further, to avoid the United States Department of Justice thrusting a Reform Agreement on the MPD, which the Brown Report ultimately concludes is unnecessary, essentially, because the City took the time to commission to the Brown Report and the Brown Report recommended some reforms.

106.    In essence, and despite any good intentions by its authors, the City used the Brown Report to circumvent true justice and lasting reform.

107.    With this framework in mind, the Brown Report found that the sanctity of life was not prioritized in MPD's decision to execute the search warrant for Randall's home pre-dawn because its Threat Assessment form to determine if a SWAT Detail should be activated fails to genuinely evaluate risks to citizens if a SWAT Detail is activated. *See* Brown Report, at p. 16, Section V, Subsection (B), (**Ex. A**).

108.    Moreover, the Brown Report found that executing this search warrant at approximately 5:40 a.m. escalated the intensity and severity of this incident because of the

confusion and panic that ensues when police officers rapidly force entry into a home while occupants are highly likely to be asleep and likely to take steps to defend themselves and their family members. *Id.*

109.    But the Brown Report failed to disclose that SWAT broke into the home while simultaneously yelling "police" as opposed to knocking on the residence's door and waiting a reasonable time for a response (as it would have done if it was executing a standard warrant).

110.    The Brown Report found that if MPD had conducted a more thorough investigation before completing the Threat Assessment and executing the search warrant, then the officers would have known that there were juveniles present in the household, including the deceased, and could have formulated a safer approach. *Id.*

111.     But the Brown report failed to acknowledge an equally, if not more likely scenario, given MPD's purported weeks-long stake out: MPD knew there were children and elderly persons living in the home and decided to execute a pre-dawn raid regardless of the enhanced danger (as it had just months prior when its officers shot and killed Kordell Jones).

112.    Indeed, upon information and belief, MPD policy mandates that the Special Operations Division Commander shall be responsible for gathering and disseminating information on current and alternative strategies along with identifying needs for special resources.

113.    Upon information and belief, Police Officer Defendants either (1) did not gather and disseminate this type of information or (2) gathered it and did not consider it prior to executing the warrant. Specifically, despite the Sheringham Residence being a large home in a quiet residential neighborhood, Police Officer Defendants failed to determine and or failed to consider the children or uninvolved persons in the home and whether alternative strategies to a predawn

raid were warranted, which under the circumstances, was wholly misaligned with the practices, customs, and principles that govern modern police work.

114.    The Brown Report concluded that the sanctity of life was not prioritized in MPD's decision to activate SWAT Detail, which was due to a manpower shortage in the Narcotics Unit and its inability to execute search warrants on large houses. *See* Brown Report, at p. 17, Section V, Subsection (B), (**Ex. A**).

115.    If Defendant Police Officers had conducted a proper investigation and threat assessment, then they would have known that none of the individuals actually in the Sheringham Residence at the time of the raid posed a danger to police officers and, further, that there were three minors, including Randall, who resided in the home. These facts would have obviated any rationale for SWAT based on the purported risk posed by Deangelo and/or the size of the Sheringham Residence.

116.    The Brown Report further concluded that failure of SWAT Detail officers to maintain their weapons in good and working order also led to the decision to use deadly force. *Id.*

117.    As the Brown Report notes, the BWC video footage captured by one of the SWAT officers leading entry into the home after breaching the front door reveals that his weapon malfunctioned during the execution of the search warrant. The Brown Report concluded that this malfunction contributed panic to the overall situation. *Id.*

118.    Importantly, this was not the first instance of SWAT rifle malfunctions—the OPR investigation noted that there were two other incidents, both of which occurred prior to the Sheringham Residence raid. During an Internal Affairs interview with the SWAT Detail Commander, the Commander stated that each officer is responsible for the maintenance of their rifle, and that there is not a written standard operating procedure on firearm maintenance.

119.    MPD General Orders reads: "It is the supervisors' responsibility to check the condition of department issued property, their personnel and their shift as part of the routine duties to be conducted weekly." General Orders 84-13; *see also* General Order 11-6 (stating that responsibilities of the Joint Operations Center Command including "routine and periodic maintenance of all equipment to ensure a readiness state").

120.    Despite the order regarding routine equipment checks, the rifle inspection conducted by a later inspector of the malfunctioning weapon found that the weapon was "completely dry (not properly lubricated)" and had "significant carbon build-up." The investigation also revealed that the "detent has significant wear due to friction, a lack of lubrication and corrosion are contributing factors to this amount of wear." *Id.* This was a recurring oversight in the examination and maintenance of MPD weapons, which contributed to the intensity of the search and could have put officer lives at risk.

121.    The Brown Report determined that, but for these failures, Randall's death may have been avoided and recommended, in part, the MPD's: (1) adoption of protocols limiting the execution of search warrants prior to 6:30 a.m. in most instances except for the most exceptional circumstances with the direct approval of the Chief of Police; (2) execution of search warrants during school hours, if possible, when children are known to occupy the property to be searched; (3) mandating the identification of children, elderly and handicapped who may be present on the premises before every SWAT operation; and (4) increasing the regularity of weapon equipment checks to prevent malfunctions by creating a policy setting forth a schedule and logging system that tracks the maintenance of MPD weapons. *Id.* at p. 17, 20.

122.    While the Brown Report took steps to acknowledge the failures within MPD, which were well-known to Defendants prior to the Report, it failed to disclose one of the most concerning

facts regarding Randall's death, which is MPD's intentional delay of timely medical aid for Randall.

123.    Indeed, without apparent basis in fact, given the initial four-minute delay in treatment and the apparent and averred delay in contacting EMS, the Brown Report erroneously found that officers immediately administered medical aid.

124.    The Brown Report fails to disclose that the SWAT officer attempting to dress Randall's wounds admitted that he could not offer the treatment that Randall needed to stay alive and that, despite this admission, MPD did not get Randall to the hospital for 50 minutes until after he had been shot.

125.    Upon information and belief, this omission is representative of numerous other omissions concerning police misconduct and failures within the MPD, related to and/or bearing upon improper pre-dawn raids, which were well-known to the City prior to Randall's death, but which have been shielded from the public in order to avoid civil liability and/or referral to the United States Department of Justice.

### C.    Chief Prine's Derogatory Comments About the Public Expose the MPD's Deliberate Indifference to the Dangers Posed by Police Raids

126.    Prior to November 13, 2023, the MPD's most senior officer, Chief Prine, exemplified the lack of concern MPD officers had for the public and, through actions taken during his tenure with the MPD, actively increased MPD officers' indifference to public safety.

127.    <u>Fuck the Public</u>: The Brown Report cites an unidentified MPD police officer in a leadership position (Officer #1) who recalls Chief Prine, early in his tenure as chief of police, stating to MPD police officers, "I'm not concerned with what the media and public thinks about the police. Fuck the public." *See* Brown Report, at p. 80, Section VII, Subsection (a), (**Ex. A**)

128.    According to Officer #1, MPD officers would go on to echo and adopt Chief Prine's viewpoint, "According to the chief, fuck the public!" *Id.*

129.    Officer #1 thought that "Chief Prine's comments adversely impacted the way some officers may police in the future." *Id.*

130.    Upon information and belief, on or about April 9, 2024, Chief Prine was placed on administrative leave by the City of Mobile because of the systemic dysfunction that was allowed to go undressed during his tenure, which exposed the City to various individual and municipal claims related to the unconstitutional use of force by MPD police officers.

131.    Indeed, Chief Prine's comments at a press conference, occurring just hours after his placement on administrative leave, evidenced the MPD's disdain for oversight and accountability related to the appropriateness of predawn raids and the use of excessive force by MPD officers. Specifically, despite not having read the Brown Report, Chief Prine preemptively attempted to discredit its findings:

> "I would argue there's nothing in that report that's credible at all," he said "They certainly can't say anything about the leadership, or they open themselves up to a whole lot of liability with cases that are ongoing to being litigated today. So it really is about veiled threats and a power struggle,"

*See* Fox News 10, *Mobile's police chief says he's been forced out, calls himself 'whistleblower'* (available at https://www.fox10tv.com/2024/04/10/mobiles-police-chief-says-hes-been-forced-out-calls-himself-whistleblower/) (site last visited July 26, 2024).

132.    According to Fox News 10, that power struggle centered on MPD's refusal to restrict the use of no-knock warrants and predawn raids. *Id.*

133.    Indeed, upon information and belief, despite knowing the danger posed by predawn raids, which include the increased risk of excessive or otherwise unnecessary force, as well as risks

of avoidable the injury and death to uninvolved persons, MPD took no action to restrict the use of such raids or lessen the danger these raids posed to members of the public.

134.    After placing Chief Prine on administrative leave, the City offered to allow him to retire with severance, which the Chief publicly declined, which ultimately led to the City voting to fire the Chief as of April 24, 2024.

135.    Apparently believing that the unconstitutional practices plaguing his department would never come to light given the potential for civil litigation, the Chief told broadcast media, "[a]nything they say that remotely attributes negligence on my leadership or the department's negligence really opens them up to a lot of civil liability in these cases that some of them have already filed lawsuits on."[2]

136.    Upon information and belief, Chief Prine's statement following his firing was intended to serve as a final warning to the City — *i.e.*, that the systemic dysfunction and unconstitutional acts occurring within the MPD during Chief Prine's decades-long tenure could come to light if the City was not careful about what it chose to say about his tenure. The City, in an effort to evade liability, has heretofore chosen to heed that warning by continuing to coverup unconstitutional acts by its Chief Prine and its other police officers.

<u>**COUNT I**</u>
**42 U.S.C. §1983 — 4th AMENDMENT EXCESSIVE FORCE VIOLATION**
**Plaintiff Against Defendant John Doe Mobile Police Officer 1**

137.    All preceding allegations are incorporated by reference as if fully set forth herein.

138.    Count I is alleged by Plaintiff against Defendant John Doe Mobile Police Officer 1.

---

[2] https://www.al.com/news/2024/04/mobile-mayor-says-police-chief-paul-prine-declined-severance-package-demanded-600000-payment.html (last accessed August 10, 2024).

139.    Plaintiff claims damages for the injuries set forth above under 42 U.S.C. Section 1983 against Defendant John Doe Mobile Police Officer 1 for the violation of Randall's clearly established constitutional rights under color of law.

140.    Defendant John Doe Mobile Police Officer 1, acting within the course and scope of his employment for Mobile, under color of state law and pursuant to the customs, policies and practices of Mobile's Police Department, intentionally and maliciously killed Randall by shooting Randall while his hands were being raised in the air and he was actively retreating by beginning to step backwards and away from Police Officer Defendants, which an objectively reasonable officer would immediately recognize as not justifying the use of deadly force and/or not warranting probable cause for a seizure, and thus deprived Randall of his rights, privileges and immunities under the Constitution of the United States and the laws of the United States.

141.    In particular, Defendant John Doe Mobile Police Officer 1 deprived Randall of the right to be free from the excessive use of force by an officer, which was clearly established at the time of Randall's death, violated his rights under the 4th Amendment to the Constitution of the United States and is actionable under 42 U.S.C. Section 1983.

142.    As a direct and proximate result of Defendant John Doe Mobile Police Officer 1's acts and omissions, including the constitutionally violative shooting and use deadly force, Randall suffered: (1) excruciating physical pain and suffering before his death; (2) severe emotional suffering and mental anguish, fear, embarrassment, shame, despair, hopelessness; (3) death; and (4) funeral and burial expenses, all of which are recoverable by Randall's Estate, through Plaintiff, as the Estate's dully-appointed personal representative.

143.    As a direct and proximate result of Defendant John Doe Mobile Police Officer 1's acts and omissions, including the violation of Randall's 4th Amendment Rights, Plaintiff

individually has, *inter alia*, suffered: (1) severe emotional distress and mental anguish, including other pain and suffering; (2) loss of moral support; and (3) loss of the society and companionship of her son, all of which damages, injuries, and suffering will in reasonable probability continue into the future and for the remainder of the Plaintiff's life. *See, e.g. Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (policies underlying 42 U.S.C. § 1983 in case of wrongful death require right of recovery for survivors, as well as for damages suffered by decedent); *Brazier v. Cherry*, 293 F.24:1401,409 (5th Cir. 1961) (same).

144.    Defendant John Doe Mobile Police Officer 1's acts and omissions were intentional, malicious, and/or involved reckless or callous indifference to Randall and his federally protected rights, justifying an award of punitive damages so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct.

145.    Alternatively, as a direct and proximate cause of Defendant John Doe Mobile Police Officer 1's acts and omissions, Randall was caused to die, rendering Defendant John Doe Mobile Police Officer 1 liable for punitive damages pursuant to the Code of Alabama § 6-5-410, as applied through 42 USC § 1988. *See*, *e.g. Gilmere v. City of Atlanta*, 864 F.2d 734, 739-740 and n.7 (11th Cir. 1989); *see also*, *Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (applying Georgia's wrongful death statue through 1988); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same).

<u>**COUNT II**</u>
**42 U.S.C. §1983 — 4th AMENDMENT BYSTANDER LIABILITY**
**Plaintiff Against Defendant John Doe Mobile Police Officers 2-20**

146.    All preceding allegations are incorporated by reference as if fully set forth herein.

147.    Count II is alleged by Plaintiff against Defendant John Doe Mobile Police Officers 2-20.

148.    Defendant John Doe Mobile Police Officers 2-20 encouraged and stood idly by while Randall was shot and killed by Defendant John Doe Mobile Police Officer 1, whose acts and omissions deprived Randall of his rights and privileges under the 4th Amendment of the Constitution of the United States.

149.    Defendant John Doe Mobile Police Officers 2-20 had an independent duty to intervene to prevent the use of excessive force by fellow officers, and they failed to fulfill that obligation to intervene when, despite sufficient time to act, they did not call for restraint after a SWAT police officer's weapon malfunctioned and Randall began to retreat.

150.    By encouraging and failing to intervene, Defendant John Doe Mobile Police Officers 2-20 effectively assisted their fellow officer in shooting and killing Randall, and thus deprived Randall of his rights and privileges under the 4th Amendment to the Constitution of the United States.

151.    As a result of the above actions, Randall and Plaintiff suffered damages as aforesaid.

## COUNT III
### 42 U.S.C. §1983 — 14th AMENDMENT DELIBERATE INDIFFERENCE
### Plaintiff Against Police Officer Defendants

152.    All preceding allegations are incorporated by reference as if fully set forth herein.

153.    Count III is alleged by Plaintiff against Police Officer Defendants.

154.    The Due Process Clause of the 14th Amendment requires government officials to provide medical aid to individuals who have been injured during an arrest and/or see that they receive necessary medical treatment. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

155.    To succeed on a claim for deprivation of medical care, a plaintiff must prove: (1) the existence of an objectively serious medical need, and (2) that the officer was deliberately indifferent to that need. *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015).

156.    The four gunshot wounds caused by Defendant Mobile Officer John Doe 1 led immediately to profuse bleeding, organ damage, and systemic shock, and thus undoubtedly constitute a serious medical need for appropriate gunshot wound treatment on the part of Randall.

157.    Based on the express admissions in the BWC, Police Officer Defendants were aware that: (1) they were unable to provide appropriate gunshot would treatment; (2) emergency medical services were necessary and should be contacted without any delay; and (3) that Randall would succumb to his injuries without appropriate gunshot wound treatment from emergency medical services personnel.

158.    Despite this knowledge, Police Officer Defendants acted with deliberate indifference to Randall's serious medical need by failing to immediately render aid to Randall and call for emergency medical services.

159.    Instead, Police Officer Defendants improperly, unnecessarily, redundantly, intentionally, and in a haphazard, unprofessional state, devoted the entirety of the large officer presence on scene to securing the Sheringham Residence, while Randall was writhing on the floor in pain, actively bleeding to death. They stepped over Randall's gravely injured body, multiple times, to do so.

160.    More than four minutes after Randall was shot by Defendant John Doe Mobile Police Officer 1, at approximately 5:44:18 a.m., a SWAT officer can be seen beginning to place bandages on Randall.

161.    Upon information and belief, Police Officer Defendants, including the SWAT officer placing bandages, knew or should have known that this effort was insufficient to treat multiple gunshot wounds, which were causing profuse bleeding, organ damage, systemic shock.

162.    Upon information and belief, Police Officer Defendants, including the SWAT officer placing bandages, knew or should have known that it was necessary to contact emergency medical services so that Randall could receive appropriate gunshot wound treatment.

163.    By 5:50 a.m., the SWAT officer who placed bandages on Randall can be heard on BWC stating, "[Randall] needs to go somewhere else without just me."

164.    Upon information and belief, prior to and at this point, no efforts had been made to alert emergency medical services of the need to treat Randall and/or Police Officer Defendants did not allow emergency medical services to retrieve Randall from the home.

165.    Police Officer Defendants were thus deliberately indifferent to Randall's serious medical need, as they intentionally, knowingly, and/or willfully failed to timely contact emergency medical services or failed to permit emergency services from accessing the body and thus prevented EMS from arriving at the Sheringham Residence until it was too late.

166.    At all relevant times, Police Officer Defendants were aware or should have been aware that a delay in appropriate gunshot wound treatment would result in Randall's untimely death. In fact, at least one Police Officer Defendant affirmatively stated that Randall needed additional care to live. Yet, Police Officer Defendants acted in such a way as to prevent Randall from receiving that care, either by failing to contact EMS or by preventing EMS from access.

167.    Due to the delay of Police Officer Defendants, Randall was not admitted to a local emergency room, which was located only 8 minutes from the Sheringham Residence, until 6:28 a.m., where he was pronounced dead.

168.    As a result of the above actions, Police Officer Defendants deprived Randall of his substantive due right to life and bodily integrity, which is protected under the 14th Amendment to the Constitution of the United States.

169.    As a result of the above actions, Randall and Plaintiff suffered damages as aforesaid.

**COUNT IV**
**42 U.S.C. §1983 — MONELL LIABILITY**
**Plaintiff Against the City of Mobile**

170.    All preceding allegations are incorporated by reference as if fully set forth herein.

171.    Count IV is alleged by Plaintiff against the City.

172.    The Police Officer Defendants acted under the color of law, and under the authority of one or more interrelated *de facto* policies, practices, and/or customs of the City to violate Randall's rights as set forth herein.

173.    Prior to November 13, 2023, it was a *de facto* policy, practice, and/or custom of the City, through its police department, chief of police, mayor, city council, and final policymakers, including Chief Prine and/or Mayor Stimpson, to inadequately supervise and train police officers, including the Police Officer Defendants, concerning the need to:

    a.    appropriately conduct stake outs to properly identify risks and dangers in executing search warrants;

    b.    appropriately conduct arrests and/or investigations to reduce or eliminate the need for high-stakes search warrant execution;

    c.    appropriately plan for search warrants to be executed in a manner that minimizes risk of injury or death to the public;

    d.    appropriately identify the dangers posed by predawn raids to members of the public;

    e.    appropriately identify the dangers posed by no-knock warrant execution to members of the public;

f.  complete required threat assessments in a way that accurately accounts for those conditions that officers are likely to encounter when executing a search warrant;

g.  consider alternatives to predawn raids when minors, elderly, disabled, and/or uninvolved persons are likely to be present at the property to be searched;

h.  effectively determine the appropriateness of predawn raids in light of case-specific circumstances;

i.  effectively identify safer alternatives to predawn raids, including, but not limited to, the "surround and call-out" method of search warrant execution;

j.  appropriately identify the risks associated with the execution of search warrants and act reasonably to limit those risks;

k.  appropriately plan for the safe execution of search warrants;

l.  ensure that no-knock warrants were not used absent exigent circumstances;

m.  require supervisory approval for no-knock warrants;

n.  require supervisor approval for predawn raids;

o.  take reasonable steps to ensure that MPD police officer weapons were maintained in working order;

p.  take reasonable steps to ensure that MPD police officers that the tools necessary to properly and safely execute search warrants;

q.  take reasonable steps to ensure MPD police officers are familiar with their weapons and know how to deploy them safely;

r.  appropriately identify whether someone in a home posed a risk while in the midst of executing a search warrant;

s.  appropriately identify themselves before executing a search warrant;

t.  appropriately knock and allow citizens a reasonable amount of time to answer the door before breaking into a home;

u.  communicate effectively during the execution of search warrants;

v.  ensure that a clear chain of command was in place during search warrant execution;

w.  ensure deadly force is employed only when permissible under MPD guidelines, policies, and protocols;

x.  employ effective de-escalation techniques;

y.  timely administer medical aid;

z.  timely ensure that any injured or maimed citizens receive necessary medical treatment;

aa. ensure that police officers were aware of their independent duty to intervene in any case whether they suspect that another police officer may use of excessive force;

bb. consider, prioritize, and protect the sanctity of human life during the execution of search warrants and, generally, during police officers' encounters with the public;

cc. appropriately identify situations warranting and weighing against use of the MPD's SWAT; and

dd. ensure that units within the MPD were appropriately staffed so that SWAT was not unnecessarily called upon to execute non-exigent search warrants.

174.    By failing to adequately supervise and train police officers, including Defendant Police Officers, concerning the aforementioned issues, the City thereby failed to adequately discourage constitutional violations on the part of MPD police officers.

175.    Upon information and belief, the City did not require appropriate in-service training or re-training of police officers who were known to engage in constitutional violations related to predawn raids, no-knock warrants, improper use of SWAT, and/or excessive uses of force.

176.    Upon information and belief, the City did not require appropriate in-service training or re-training of police officers who were known to engage in improper, intentional, willful, reckless, and/or negligent predawn raids.

177.    Upon information and belief, the City did not require appropriate in-service training or re-training of police officers who were known to engage in improper, intentional, willful, reckless, and/or negligent no-knock warrant service.

178.    Upon information and belief, the City did not require appropriate in-service training or re-training of police officers who were known to engage in improper, intentional, willful, reckless, negligent, and/or excessive uses of force on members of the public.

179.    Moreover, it was the *de facto* policy, practice, and/or custom of the City, through its police department, chief of police, mayor, and council, to inadequately supervise and train MPD police officers, including the Police Officer Defendants, to intervene and/or report constitutional violations and misconduct committed by their fellow police officers.

180.    The City, acting through its police department, chief of police, mayor, and council, has adopted and continues to maintain a recognized and accepted policy, custom, and/or practice of systematically engaging in dangerous predawn raids and no-knock warrant service, without regard to the model and accepted policies governing the execution of search warrants, which has resulted in subjecting other persons, including innocent bystanders, like Randall, to unjustifiable risks of property damage, personal injury, and death.

181.    Before MPD killed Randall Adjessom, the City, acting through its police department, chief of police, mayor, and council, was fully aware of the dangers posed by predawn raids, particularly those undertaken by SWAT officers, and the resultant need for proper training and supervision of their police officers, but the City was deliberately indifferent to those risks and failed to properly train and supervise their police officers regarding those risks.

182.    As a result of the above-described practices, policies, and/or customs, as well as Chief Prine's derogatory comments regarding the public and the Mayor's meaningless promise to end predawn raids post Kordell's death but pre Randall's death, the City's police officers, including the Police Officer Defendants, believed that their actions would not be properly

monitored by supervisory police officers and/or other employees of the City, that this improper conduct would not be investigated or sanctioned, and would be tolerated and condoned by the City.

183.    The above actions by the City were the moving force behind Defendant Police Officers' unconstitutional actions and thus caused Randall to be deprived of life, thereby violating Randall's 4th (excessive force) and 14th (substantive due process) Amendment rights under the United States Constitution.

## COUNT V
## ALABAMA STATE LAW — NEGLIGENCE/WRONGFUL DEATH (Vicarious Liability) Plaintiff Against the City of Mobile

184.    All preceding allegations are incorporated by reference as if fully set forth herein.

185.    Count V is alleged by Plaintiff against the City.

186.    Police Officer Defendants were the agents, servants, workmen, and employees of the City, and at all relevant times were engaged in the service and the performance of their duties as police officers employed by or as agents of the City.

187.    The negligence, carelessness, and/or recklessness of the Police Officer Defendants acting alone, jointly, and/or in concert and conspiracy, acting at all times relevant hereto as police officers for the MPD and the City, was the direct and proximate cause the injuries and damages sustained by Plaintiff. This conduct consisted of, but was not limited to:

    a.  failing to appropriately plan to execute the search warrant at the Sheringham Residence in a manner that minimized risk of injury or death to the public;

    b.  failing to appropriately identify the dangers posed to the occupants of the Sheringham Residence by the planned predawn;

    c.  planning and executing, for all intents and purposes, a no-knock warrant without having reasonable grounds to believe that knocking and announcing its presence would create an imminent threat of physical violence to the officers or to another person.

d.  planning and executing a predawn warrant without having reasonable grounds to believe that execution of the warrant during daylight hours would create an imminent threat of physical violence to officers or to another person.

e.  failing to seek judicial authorization for a predawn, no-knock entry;

f.  failing to obtain supervisory approval for a predawn, no-knock entry;

g.  failing to obtain felony-level prosecutor's office approval for a predawn, no-knock entry;

h.  failing to accurately complete the required threat assessment in a way that accounted for those conditions that officers were likely to encounter when executing the search warrant at the Sheringham Residence;

i.  failing to consider alternatives to a predawn raid at the Sheringham Residence where police officers knew or should have known that minors and/or uninvolved were present and/or likely to be present;

j.  failing to effectively determine the appropriateness of a predawn, no-knock raid at the Sheringham Residence in light of the case specific circumstances;

k.  failing to effectively identify safer alternatives to a predawn raid at the Sheringham Residence, including, but not limited to, the "surround and call-out" method of search warrant execution;

l.  failing to take reasonable steps to ensure that MPD police officer weapons were maintained in working order for the predawn raid on the Sheringham Residence;

m.  failing to take have the tools and equipment necessary to properly and safely execute a search warrant at the Sheringham Residence;

n.  failing to communicate effectively during the execution of the search warrant at the Sheringham Residence;

o.  failing to have and/or adhere to ensure a chain of command during execution of the search warrant at the Sheringham Residence;

p.  failing to adhere to guidelines, policies, and protocols governing the use of deadly force during execution of the search warrant at the Sheringham Residence;

q.  failing to employ effective de-escalation techniques during execution of the search warrant at the Sheringham Residence;

r.  failing to timely administer medical aid to Randall;

s.  failing to timely notify emergency services that they had shot Randall multiple times and that he, consequently, needed immediate life-saving medical care;

t.  failing to timely and accurately communicate with emergency medical service personnel during execution of the search warrant at the Sheringham Residence;

u.  improperly using deadly force on Randall; and

v.  failing to properly intervene to stop the use of deadly force on Randall.

188.  As a direct and proximate result of the negligent, careless, and/or reckless conduct of the Police Officer Defendants, Randall suffered an untimely death and the damages set forth above.

189.  The City is liable for the negligent, careless and/or reckless acts of its agents, servants, workmen and/or employees, the Police Officer Defendants, as set forth herein pursuant to the doctrine of *respondeat superior* and is thus liable to Plaintiff for damages, including those articulated herein.

190.  Accordingly, Plaintiff assets this claim for Randall's Wrongful Death and seeks all damages recoverable pursuant to Alabama Code §6-5-410.

<u>COUNT VI</u>
**ALABAMA STATE LAW — NEGLIGENCE/WRONGFUL DEATH (Direct Liability)**
**Plaintiff Against the City of Mobile**

191.  All preceding allegations are incorporated by reference as if fully set forth herein.

192.  Count VI is alleged by Plaintiff against the City.

193.  The negligence, carelessness, and/or recklessness of the City was the direct and proximate cause the injuries and damages sustained by Plaintiff. This conduct consisted of, but was not limited to:

a.  failing to appropriately select and hire officers capable of safely effectuating search warrants;

41

b.  failing to appropriately train, supervise, discipline and terminate police officers who the City knew or should have known were unable or unwilling to safely effectuate search warrants;

c.  failing to appropriately plan for search warrants to be executed in a manner that minimizes risk of injury or death to the public;

d.  failing to appropriately identify the dangers posed by predawn raids to members of the public;

e.  failing to appropriately identify the dangers posed by no-knock warrant execution to members of the public;

f.  failing to complete required threat assessments in a way that accurately accounts for those conditions that officers are likely to encounter when executing a search warrant;

g.  failing to consider alternatives to predawn raids when minors, elderly, disabled, and/or uninvolved persons are likely to be present at the property to be searched;

h.  failing to effectively determine the appropriateness of predawn raids in light of case specific circumstances;

i.  failing to effectively identify safer alternatives to predawn raids, including, but not limited to, the "surround and call-out" method of search warrant execution;

j.  failing to appropriately identify the risks associated with the execution of search warrants;

k.  failing to appropriately plan for the safe execution of search warrants;

l.  failing to ensure that no-knock warrants were not used absent exigent circumstances;

m.  failing to require supervisory approval for no-knock warrants;

n.  failing to require supervisor approval for predawn raids;

o.  failing to take reasonable steps to ensure that MPD police officer weapons were maintained in working order;

p.  failing to take reasonable steps to ensure that MPD police officers that the tools necessary to properly and safely execute search warrants;

q.  failing to communicate effectively during the execution of search warrants;

42

r.  failing to ensure that a clear chain of command was in place during search warrant execution;

s.  failing to ensure deadly force is employed only when permissible under MPD guidelines, policies, and protocols;

t.  failing to employ effective de-escalation techniques;

u.  failing to timely administer medical aid;

v.  failing to timely ensure that any injured or maimed suspects receives necessary medical treatment;

w.  failing to ensure that police officers were aware of their independent duty to intervene in any case whether they suspect that another police officer may use of excessive force;

x.  failing to consider, prioritize, and protect the sanctity of human life during the execution of search warrants and, generally, during police officers' encounters with the public;

y.  failing to appropriately identify situations warranting and weighing against use of the MPD's SWAT; and

z.  failing to ensure that units within the MPD were appropriately staffed so that SWAT was not unnecessarily called upon to execute search warrants.

194.  As a direct and proximate result of the negligent, careless, and/or reckless conduct of the Police Officer Defendants, Randall suffered an untimely death and the damages set forth above.

195.  Accordingly, Plaintiff assets this claim for Randall's Wrongful Death and seeks all damages recoverable pursuant to Alabama Code §6-5-410.

## <u>COUNT VII</u>
### 42 U.S.C. §1983 — 4th AMENDMENT EXCESSIVE FORCE AND UNLAWFUL DETENTION
### Plaintiff, Individually, Against Defendant Police Officers

196.  All preceding allegations are incorporated by reference as if fully set forth herein.

197.    Count VII is alleged by Plaintiff in her individual capacity against Defendant Police Officers.

198.    Defendant Police Officers unlawfully detained and seized Plaintiff, and thus deprived her of her constitutionally protected right to be free from the use of excessive force by forcing her to remain in the front room of the Sheringham Residence for multiple hours after they had shot and killed her son.

199.    During that time in which Plaintiff was unlawfully detained, Plaintiff had not committed any crime and Defendant Police Officers did not have any reason whatsoever to suspect that Plaintiff had committed any crime.

200.    During that time in which Plaintiff was unlawfully detained, as was or should have been known to Defendant Police Officers and any reasonable police officer, Plaintiff did not pose any threat to Defendant Police Officers and her detention was unnecessary for the integrity of the any ongoing criminal investigation.

201.    During the time in which Plaintiff was unlawfully detained, at least one or more visibly armed Defendant Police Officers guarded the door to the room in which Plaintiff was detained, which constituted an unnecessary, unreasonable, and excessive use of force under the circumstances. Plaintiff asked on numerous occasions why she and her family were being detained and received no response from Defendant Police Officers, who continued, at all times, to use excessive force through their armed presence, verbal commands, and physical blocking of the door to the front room of the Sheringham Residence.

202.    Defendant Police Officers knew or should have known that no reasonable police officer would believe the seizure and detention of Plaintiff for a period of hours was reasonable or somehow authorized by law.

203.    For forty minutes of this unlawful seizure and detention, Plaintiff's son lay riddled with bullet wounds dying a few feet away.

204.    Defendant Police Officers did not permit Plaintiff to comfort her son as he took his last breaths.

205.    Defendant Police Officers did not permit Plaintiff to call for emergent medical care for her son.

206.    By detaining Plaintiff while her son lay dying feet from where she was kept, Defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct.

207.    Defendant Police Officers detention of Plaintiff was extreme and outrageous and caused Plaintiff emotional distress so severe that no reasonable person could be expected to endure it.

208.    Defendant Police Officers conduct went beyond all possible bounds of decency and is utterly intolerable in a civilized society.

209.    Plaintiff sustained and continues to suffer from severe emotional stress as a result of Police Officer Defendants' unconstitutional use of excessive force.

210.    As a result of Police Officer Defendants' actions, Plaintiff was deprived of her constitutional right under the 4th Amendment to be free from the use of excessive force and suffered damages as aforesaid.

### COUNT VIII
### ALABAMA STATE LAW — FALSE IMPRISONMENT
### Plaintiff, Individually, Against Defendant Police Officers

211.    All preceding allegations are incorporated by reference as if fully set forth herein.

212.    Count VIII is alleged by Plaintiff in her individual capacity against Defendant Police Officers.

213.    Defendant Police Officers directly restrained Plaintiff through the exercise of excessive force and/or through their express and implied threat of force, thereby depriving Plaintiff of her liberty by forcing her to go where she did not wish to go, which was the front room of the Sheringham Residence, and by forcing her to remain where she did not wish to remain, which was the front room of the Sheringham Residence.

214.    During the time in which Plaintiff was unlawfully detained, Police Officer Defendants acted without probable cause to detain Plaintiff and thus with actual and/or legal malice in their detention of Plaintiff.

215.    During the time in which Plaintiff was unlawfully detained, Police Officer Defendants lacked the authority to legally detain Plaintiff, who had done nothing wrong and was not suspected of any wrongdoing, and thus Police Officer Defendants did not have the discretion to detain her for hours during their attempts to cover up the unlawful killing of Randall.

216.    By detaining Plaintiff while her son lay dying feet from where she was kept, Defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct.

217.    Defendant Police Officers detention of Plaintiff was extreme and outrageous and caused Plaintiff emotional distress so severe that no reasonable person could be expected to endure it.

218.    Defendant Police Officers conduct went beyond all possible bounds of decency and is utterly intolerable in a civilized society.

219.    Plaintiff sustained and continues to suffer from severe emotional stress as a result of Police Officer Defendants' unlawful detention and false imprisonment.

220.    Accordingly, Plaintiff assets this claim for False Imprisonment and seeks all damages recoverable pursuant to Alabama Code § 6-5-170.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Akouvi Adjessom, individually and as administratrix of the Estate of Randall Adjessom, deceased, respectfully requests that the Court enter judgment in her favor and against Defendants on all counts of the complaint, and award relief as follows:

A.  Compensatory damages against the Defendants, jointly and severally, in an amount to be determined at trial;

B.  Punitive damages against the individual Police Officer Defendants for their conduct in an amount to be determined at trial, in order that such award will deter similar prohibited behavior by defendants and other law enforcement officers in the future;

C.  Pre-judgment and post-judgment interest and recovery of Plaintiffs' costs, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988 and 42 U.S.C. §1920, against Defendants, jointly and severally;

D.  All damages recoverable pursuant to Alabama Code §6-5-410, and

E.  Any and all other relief to which Plaintiffs may be entitled.

Respectfully submitted this 18th day of December, 2024.

**BUCHANAN LAW FIRM, P.C.**

*/s/ Jerry A. Buchanan*
Jerry A. Buchanan, Esquire
233 12th Street
Suite 614
Columbus, GA 31901
706-323-2848
Alabama Bar# 9094U75J
jab@thebuchananlawfirm.com

**GRANT & EISENHOFER P.A.**

Elizabeth A. Bailey (PHV forthcoming)
Steven A. Medina (PHV forthcoming)
Cythina B. Morgan (PHV forthcoming)
123 Justison Street
Wilmington, DE 19801
302-622-7086
ebailey@gelaw.com
smedina@gelaw.com
cmorgan@gelaw.com

*Attorneys for Plaintiff Akouvi Adjessom,
individually and as administratrix of the
Estate of Randall Adjessom*