**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| AKOUVI ADJESSOM, individually and as Administratrix of the ESTATE OF RANDALL ADJESSOM, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. 1:24-cv-472-TFM-B |
| | ) | |
| CITY OF MOBILE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is *The Police Officer Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint* (Doc. 78, filed August 1, 2025) in which Defendants Charles DeGeer, Gerald Ripple, David Reyes, Jalon Robinson, Clinton Law, Scott Hanks, Robert Davis, Daryl Gipson, Kyle Carag, Josh Evans, Steven Laster, Jonathan Myers, Blake Tillman, Steven Guidry, Brian Rivers, Christian Bryant, Jordan Soto, Oliver Simpson, Elizabeth Lowry, Charles Hunter, Philip Morris, and Caitlyn Williams motion the Court, pursuant to Fed. R. Civ. P. 12(b)(6), dismiss the claims that are brought against them in Plaintiff Akouvi Adjessom's, individually and as Administratrix of the Estate of Randall Adjessom, deceased, Second Amended Complaint.  Having considered the motion (Doc. 78) and memorandum in support (Doc. 79), response (Doc. 85), reply (Doc. 94), and relevant law, the Court finds the motion is due to be **GRANTED in part and DENIED in part**.

Also pending before the Court is the *Motion for Leave to File Evidentiary Materials in Support of the Police Officer Defendants' Reply Brief Under Seal* (Doc. 93, filed October 1, 2025) in which Defendants Charles DeGeer, Gerald Ripple, David Reyes, Jalon Robinson, Clinton Law,

Scott Hanks, Robert Davis, Daryl Gipson, Kyle Carag, Josh Evans, Steven Laster, Jonathan Myers, Blake Tillman, Steven Guidry, Brian Rivers, Christian Bryant, Jordan Soto, Oliver Simpson, Elizabeth Lowry, Charles Hunter, Philip Morris, and Caitlyn Williams request the Court's leave to file under seal additional body worn camera footage in support of their reply brief to their motion to dismiss. Having considered the motion and relevant law, the Court finds the motion is due to be **GRANTED in part and DENIED in part**.

## I.        PARTIES, JURISDICTION, AND VENUE

Plaintiff Akouvi Adjessom, individually and as administratrix of the Estate of Randall Adjessom, deceased, is Randall Adjessom's mother. Doc. 73 at 4. In this Memorandum Opinion and Order, Akouvi Adjessom will be referred to as "Plaintiff" and Randall Adjessom will be referred to as "Randall."[1]

Defendants Charles DeGeer, Gerald Ripple, David Reyes, Jalon Robinson, Clinton Law, Scott Hanks, Robert Davis, Daryl Gipson, Kyle Carag, Josh Evans, Steven Laster, Jonathan Myers, Blake Tillman, Steven Guidry, Brian Rivers, Christian Bryant, Jordan Soto, Oliver Simpson, Elizabeth Lowry, Charles Hunter, Philip Morris, and Caitlyn Williams will be collectively referred to in this Memorandum Opinion and Order as "the Police Officer Defendants."[2]

Defendant City of Mobile will be referred to in this Memorandum Opinion and Order as "the City."

---

[1] When Randall was shot and killed on November 13, 2023, he was sixteen (16) years old. Doc. 73 at 7, 19. Normally, in orders that are issued by the Court, a minor would be identified by their initials, but the Court will refer to Randall by his name since he is deceased and identified in pleadings, which renders unnecessary the use of identifying initials.

[2] The Court clarifies, the designation "the Police Officer Defendants" does not include Defendant Osviel Vigoa-Martinez, who filed a separate answer to the Second Amended Complaint and is not a party to the instant motion to dismiss.

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question).

The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. The district court has personal jurisdiction over the claims in this action because the events that gave rise to this action are alleged to have occurred within this judicial district. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint . . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated. The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state."). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions that gave rise to this litigation occurred in this judicial district.

## II.    BACKGROUND

### A.    Procedural Background

On December 18, 2024, Plaintiff originally filed her Complaint with this Court, in which she brought claims against the City, John Doe Mobile Police Officer 1, and John Doe Mobile Police Officers 2-20, individually as police officers for the MPD, excessive force in violation of the Fourth Amendment, bystander liability pursuant to the Fourth Amendment, deliberate indifference in violation of the Fourteenth Amendment, *Monell* [*v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978)] liability, direct and various liability for negligence/wrongful death, excessive force and unlawful detention in violation of the Fourth

Amendment, and false imprisonment.  Doc. 1.  The City filed its answer to the Complaint on March 14, 2025.  Doc. 9.

On March 20, 2025, the Court ordered Plaintiff to show cause why the fictitious defendants that were named in her Complaint should not be stricken.  Doc. 11.  Plaintiff timely filed a response to the Court's show cause order in which she stated the parties conferred and the City identified the law enforcement officers it understood were referenced in the Complaint as fictitious parties. Doc. 15.  Plaintiff, therefore, requested the Court grant her leave to file an amended complaint, which was attached to her response.  *Id.*  The Court granted Plaintiff's request for leave to file her Amended Complaint (Doc. 16), which she filed on April 17, 2025 (Doc. 17).  In the Amended Complaint, Plaintiff named as defendants the Police Officer Defendants and accordingly assigned her claims that were pled in her original Complaint to the corresponding identified officers.  *Id.* On July 6, 2025, the Police Officer Defendants filed a motion to dismiss (Doc. 66), and memorandum (Doc. 67) and evidentiary material (Doc. 68) in support of the motion.  Defendant Vigoa-Martinez filed a separate answer to the Amended Complaint on the same date.  Doc. 69.

On July 18, 2025, Plaintiff filed as a matter of course, pursuant to Fed. R. Civ. P. 15 (a)(1)(B), a Second Amended Complaint, which is the operative pleading for purposes of this Memorandum Opinion and Order.  Doc. 73.  The Second Amended Complaint also mooted the Police Officer Defendants' first motion to dismiss.  Doc. 75.

In the Second Amended Complaint, Plaintiff brings the following claims against the following defendants that include the City and the Police Officer Defendants:

- Count 1 – Excessive force in violation of the Fourth Amendment, and asserted pursuant to 42 U.S.C. § 1983, against Defendant Vigoa-Martinez;

- Count 2 – Bystander liability in violation of the Fourth Amendment, and asserted

pursuant to 42 U.S.C. § 1983, against Defendants Hank, Davis, Gipson, Carag, Morris, Evans, Laster, Myers, Tillman, Guidry, Rivers, Bryant, Soto, Simpson, and Lowry;

- Count 3 – Deliberate indifference in violation of the Fourteenth Amendment, and asserted pursuant to 42 U.S.C. § 1983, against the Police Officer Defendants;

- Count 4 – *Monell* liability, asserted pursuant to 42 U.S.C. § 1983, against the City;

- Count 5 – Negligence/wrongful death, based on vicarious liability, against the City;

- Count 6 - Negligence/wrongful death, based on direct liability, against the City;

- Count 7 – Excessive force and unlawful detention in violation of the Fourth Amendment, and asserted pursuant to 42 U.S.C. § 1983, against the Police Officer Defendants, individually; and

- Count 8 – False imprisonment against the Police Officer Defendants, individually.

On August 1, 2025, the Police Officer Defendants filed a motion to dismiss Plaintiff's Second Amended Complaint (Doc. 78), and memorandum (Doc. 79) and evidentiary material (Doc. 80) in support of the motion. The evidentiary material in support of the instant motion to dismiss consists of body worn camera footage that was filed in support of the motion to dismiss the Amended Complaint and, on motion (Doc. 62), was provisionally sealed pending the Court's review and determination on the motion to dismiss (Doc. 75). On the same date, Defendant Vigoa-Martinez filed a separate answer to the Second Amended Complaint. Doc. 81. The Court entered a show cause Order for Plaintiff to respond to the motion to dismiss and set a deadline for the Police Officer Defendants to file a reply. Doc. 82. Plaintiff timely file a response (Doc. 85) to the motion to dismiss and evidentiary materials (Doc. 86) in support of the response for which she also filed a motion to seal (Doc. 87) those evidentiary materials, which consist of additional body

worn camera footage.  The Court, as with the Police Officer Defendants' motion to seal, provisionally sealed the body worn camera footage pending the Court's review and determination on the motion to dismiss.  Doc. 89.  The Police Officer Defendants timely filed a reply (Doc. 94) to the motion to dismiss and evidentiary materials (Doc. 95) in support of the response for which they also filed a motion to seal (Doc. 93) those evidentiary materials, which consist of more body worn camera footage.

The motion to dismiss and motion to seal are ripe for review, and the Court finds oral argument unnecessary to resolve the motions.  The Court will enter additional instructions as to the motions to seal on which it has already ruled.

**B.     Body Worn Camera Footage**

**1.      Incorporation by Reference of Body Worn Camera Footage**

The Police Officer Defendants attach to their motion to dismiss body worn camera footage of the sequence of events that are relevant to Plaintiff's claims against the Police Officer Defendants in her Second Amended Complaint.  Doc. 79 at 6.  The Police Officer Defendants argue the body worn camera footage should be considered by the Court for its determination of the instant motion to dismiss because the footage is central to Plaintiff's claims, indisputably depicts the events that are described in the Second Amended Complaint, and is authentic.  *Id.* at 7-8.

In response, Plaintiff argues, on a motion to dismiss, if the Court considers the body worn camera footage, which is evidence outside of the pleadings, the Court must convert the Police Officer Defendants' motion to dismiss to a motion for summary judgment that would necessitate the Court provide notice to the parties and an opportunity to present additional evidence and argument under the appropriate standard.  Doc. 85 at 14.  Plaintiff argues the incorporation-by-

reference doctrine, by which other courts have considered body worn camera footage for a motion to dismiss, is not satisfied because the subject footage was recorded in an area with poor lighting, the footage that was submitted is only from six of the twenty-three law enforcement officers who were involved in the relevant events of this action, the Police Officer Defendants failed to provide Plaintiff with certain footage of the relevant events in this action, the footage does not depict certain events that are relevant to the events of this action, and the footage does not provide a clear depiction of the events that occurred. *Id.* at 17-18. Despite the deficiencies of the body worn camera footage that Plaintiff identifies, she argues the footage supports certain details of what she has pled in her Second Amended Complaint and contradicts the Police Officer Defendants' interpretation of the relevant events of this action. *Id.* at 19. Finally, Plaintiff challenges the authenticity of the body worn camera footage that was submitted by the Police Officer Defendants because the time stamps on some of the footage do not align with each other and footage from certain officers is incomplete because their body worn cameras were turned off at certain points during the relevant events of this action. *Id.* at 19-20.[3]

In reply, the Police Officer Defendants argue the body worn camera footage that they submitted in support of their motion to dismiss clearly shows the events that are described in Plaintiff's Second Amended Complaint because the officers' flashlights illuminate the scene of

---

[3] Plaintiff opposed (Doc. 64) the Police Officer Defendants' motion to seal (Doc. 62) the body worn camera footage (Docs. 80-1 through -6) that they submitted in support of their motion to dismiss and filed her own motion to seal (Doc. 87) additional body worn camera footage (Docs. 85-1 through -3) that she submitted in support of her response to the motion to dismiss in conformity with the Court's previous Order (Doc. 75) that provisionally sealed the Police Officer Defendants' footage. In sum, Plaintiff's position is the body worn camera footage that has been filed in support of the motion to dismiss and subsequent briefing should not be sealed and should be publicly available. Further, while Plaintiff argues in her response to the motion to dismiss the body worn camera footage should not be considered on a motion to dismiss standard, and the Court should convert the motion to one for summary judgment, she provides extensive argument against the motion to dismiss based on the footage. *See* Doc. 85.

the events and the footage provides both video and audio of the events. Doc. 94 at 4-5. The Police Officer Defendants argue it is unnecessary to submit the body worn camera footage from all of the law enforcement officers who were at the scene of the relevant events and the footage that was submitted was from the body worn camera of the officers against whom Plaintiffs brings her bystander-liability and deliberate-indifference claims, after narrowing in her response to the motion to dismiss those officers against whom she brings those claims. *Id.* at 5. The Police Officer Defendants argue they have submitted with their reply additional body worn camera footage from three additional officers so that footage from the body worn cameras from all of the law enforcement officers against whom Plaintiff brings her claims has been submitted. *Id.* at 5-6 The Police Officer Defendants argue the inconsistent time stamps of the body worn camera footage that they submitted in support of their motion to dismiss is inconsequential and does not indicate the footage was altered. *Id.* at 6-7.

> In general, district courts must limit their consideration to the pleadings and any exhibits attached to the pleadings when ruling on a motion to dismiss. *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000). If a party presents, and the court considers, evidence outside of the pleadings, the general rule requires the district court to convert the motion to dismiss into a motion for summary judgment. *See* FED R. CIV. P. 12(d); *Finn v. Gunter*, 722 F.2d 711, 713 (11th Cir. 1984). However, there are two exceptions to the general rule: (1) the incorporation-by-reference doctrine and (2) judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L.Ed.2d 179 (2007).
>
> . . .
>
> Under the incorporation-by-reference doctrine, a district court may consider evidence attached to a motion to dismiss without converting the motion into a motion for summary judgment "if the document is (1) central to the plaintiff's claim; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

*Swinford v. Santos*, 121 F.4th 179, 186-87 (11th Cir. 2024). The Eleventh Circuit has allowed body worn camera footage to be considered for a motion to dismiss pursuant to the incorporation-

Page 8 of 48

by-reference doctrine if the footage is central to the plaintiff's claim and undisputed. *See id*. at 186-88; *Johnson*, 107 F.4th at 1300-01.

Here, the Court finds the requirements of the incorporation-by-reference doctrine are met insofar as the body worn camera footage depicts the events that are described in Plaintiff's Second Amended Complaint and pertain to her bystander-liability and deliberate-indifference claims. Further, as to the authenticity of the body worn camera footage, the Court finds, insofar as there are inconsistencies between the time stamps in certain of the body worn camera footage, such inconsistencies do not implicate the authenticity of the footage, to which each of the law enforcement officers attested in their affidavits that were submitted with the footage. As to the still shots from the body worn camera footage that are incorporated with the Police Officer Defendants' motion and include red circles for emphasis, the Court recognizes those images are demonstrative to support their arguments and will refer to the original footage to determine the sequence of events. Accordingly, the Court will consider the body worn camera footage for the instant motion to dismiss, and having determined such, will recite the facts under the applicable Fed. R. Civ. P. 12(b)(6) standard. Further, the Court declines to convert the instant motion to dismiss to a motion for summary judgment because of its consideration of the body worn camera footage based on the incorporation-by-reference doctrine.

### 2.    Motions to Seal Body Worn Camera Footage

The parties filed three separate motions to seal body worn camera footage that were filed in conjunction with the instant motion to dismiss, and its response and reply. Docs. 62, 87, 93.

As to the first motion to seal (Doc. 62), the Court entered an Order on July 22, 2025, which reads in relevant part:

> Also pending are the *Motion for Leave to File Evidentiary Materials Under Seal* (Doc. 62, filed 7/2/25) and the *Plaintiff's Opposition to Defendants' Motion for*

*Leave to File Evidentiary Materials Under Seal* (Doc. 64, filed 7/3/25). The Local Rules require a party who seeks a sealing order to file an unsealed written motion that contains "[a] generic, non-confidential identification of the document to be sealed," "[t]he basis upon which the party seeks the order, including the reasons why alternatives to sealing are inadequate," and "[t]he duration for which sealing is requested." S.D. Ala. GenLR 5.2(2)(A)-(C). The moving party must also attach to their motion "a proposed unsealed order granting the motion and setting forth the basis for the Court's action" and "file, *in camera and under seal*, the document proposed to be sealed." S.D. Ala. GenLR 5.2(2). However, in addition to that requirement, the Court must also consider public access to courts. The Court finds that the current motion is insufficient to make that determination.

"It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). Further, "[t]he operations of courts and the judicial conduct of judges are matters of utmost public concern." *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 839 (1978)). "The common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process. *Romero v. Drummond Co.,* 480 F.3d 1234, 1245 (11th Cir. 2007) (quoting *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001)). The Eleventh Circuit recently reaffirmed the need for "resolute" enforcement of the presumption that the public should have access to judicial records. *Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1359 (11th Cir. 2021). "What happens in the halls of government is presumptively public business. Judges deliberate in private, but issue public decisions after public arguments based on public records." *Union Oil Co. of Cal. V. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000). The common-law right of access favors access to judicial records and includes "the right to inspect and copy public records and documents." *Chicago Tribune*, 263 F.3d at 1311. However, the right is not absolute. *Id*. It does not apply to discovery, and where it does apply, it may be overcome by a showing of good cause. *Romero*, 480 F.3d at 1245.

"[M]aterial filed with discovery motions is not subject to the common-law right of access, whereas discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right." *Chicago Tribune*, 263 F.3d at 1311-12; *see also Comm'r, Ala. Dep't of Corr. V. Advance Local Media, LLC*, 918 F.3d 1161, 1166 (11th Cir. 2019) (quoting *FTC v. AbbVie Prods., LLC*, 713 F.3d 54, 62 (11th Cir. 2013)) ("The common law right of access to judicial records establishes a general presumption that criminal and civil actions should be conducted publicly and includes the right to inspect and copy public records and documents. It is an essential component of our system of justice' and 'is instrumental in securing the integrity of the process.") (internal quotations and modifications omitted). "[T]he need for public access to discovery is low because discovery is 'essentially a private process . . . the sole purpose of which is to assist trial preparation.'" *Romero*, 480 F.3d at 1245 (quoting *United States v.*

*Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986)).  In short, the distinction lies in the comparison of "material filed with discovery motions and material filed in connection with more substantive motions."  *Chicago Tribune*, 263 F.3d at 1312. By way of an example, attachments to a motion to compel are not subject to the common-law right, whereas attachments to pretrial motions which require judicial resolution on the merits are subject to the common-law right.  In the latter category, one may only overcome the common-law right by a showing of good cause. *Romero*, 480 F.3d at 1246.  This standard parallels the "good cause" standing of Federal Rule of Civil Procedure 26(c) governing protective orders.  The good cause "standard requires the district court to balance the party's interest in obtaining access against the other party's interest in keeping the information confidential." *Chicago Tribune*, 263 F.3d at 1313.  When considering that balancing test, the *Romero* Court stated as follows:

> In balancing the public interest in accessing court documents against a party's interest in keeping the information confidential, courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents.

*Romero*, 480 F.3d at 1246.

"[T]he judge is the primary representative of the public interest in the judicial process and is duty-bound therefore to review any request to seal the record (or part of it).  He may not rubber stamp a stipulation to seal the record."  *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999) (citations omitted).

At present, these matters do not appear to fall within discovery as they are part of the motion to dismiss and therefore the public access to courts analysis is triggered. However, as that particular motion to dismiss has been denied as moot, the video evidence has not yet been relied upon by the Court in deciding on a dispositive motion.  That said, considering the record and the newly filed Joint Motion for Leave to Exceed Page Limitations (Doc. 74) which references a likely new Rule 12 motion to dismiss that will be filed with presumably the same evidence, the Court will go ahead and rule on the issue for clarity's sake at this time.

For the time being, the motion (Doc. 62) is **GRANTED in part** and **DENIED in part**. The video footage will remain **PROVISIONALLY SEALED** pending the Court's review and determination on the motion to dismiss. However, the Plaintiff's objections are also well taken, and the law favors public access to Courts especially as it relates to Court decisions.  Therefore, once the motion to dismiss has been ruled upon, if the video evidence is relied upon in resolving any dispositive

motions, it is the Court's intention to unseal the videos (regardless of whether the motions are granted or denied). However, the Court would delay the unsealing for a sufficient period necessary for any party to file any interlocutory appeal (should one be appropriate). At that point, should any party wish for the video to remain under seal pending the appeal, then they would need to file a motion to seal before the Eleventh Circuit for review and determination. Moreover, while the exhibit will be unsealed after a ruling on the motion to dismiss, the Court may still place restrictions on its dissemination and how the public may access the evidence at issue. This ruling will be finalized with a more specific order once that time arrives.

Doc. 75 (emphasis in original).

As to the second motion to seal (Doc. 87), the Court entered an Order on September 9, 2025, which reads in relevant part:

[C]onsistent with the Court's July 22, 2025 Order, the motion (Doc. 87) is **GRANTED in part** and **DENIED in part**. Plaintiff's BWC footage that is submitted in support of her opposition to the motion to dismiss – Exhibits A, B, and C that are referenced in her notice of filing evidentiary materials (Doc. 86) and were submitted to the Clerk of Court to be filed under seal - will remain **PROVISIONALLY SEALED** pending the Court's review and determination on the motion to dismiss.

The Court notes, as it did in its July 22, 2025 Order, Plaintiff's objections to sealing the BWC footage are well taken, and the law favors public access to Courts especially as it relates to Court decisions. Therefore, once the motion to dismiss has been ruled upon, if the video evidence is relied upon in resolving any dispositive motions, it is the Court's intention to unseal the videos (regardless of whether the motions are granted or denied). However, the Court would delay the unsealing for a sufficient period necessary for any party to file any interlocutory appeal (should one be appropriate). At that point, should any party wish for the video to remain under seal pending the appeal, then they would need to file a motion to seal before the Eleventh Circuit for review and determination. Moreover, while the exhibit will be unsealed after a ruling on the motion to dismiss, the Court may still place restrictions on its dissemination and how the public may access the evidence at issue. This ruling will be finalized with a more specific order once that time arrives.

Doc. 89 (emphasis in original).

Here, as detailed in the factual background below, the Court reviewed all of the body worn camera footage that was submitted in support of the instant motion to dismiss and subsequent briefing by both parties, and further relied on the footage to resolve the arguments that are

presented in the motion.

Accordingly, the body worn camera footage (Docs. 80-1 through -6, 85-1 through -3, 95-1 through -3) that was filed in support of the instant motion to dismiss, and its response and reply, will remain **PROVISIONALLY SEALED** for forty (40) days after this Memorandum Opinion and Order is entered, which allows for any party to decide whether to file an interlocutory appeal and petition the appellate court continue to seal the body worn camera footage.  FED. R. APP. P. 4(a)(1)(A); *see Mitchell v. Forsyth*, 472 U.S. 511, 530 ("[T]hat a district court's denial of a claim of qualified immunity, to the extent it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.").  If an appeal of this Memorandum Opinion and Order is not timely filed and a request to seal the aforementioned body worn camera footage is not filed with the appellate court, the body worn camera footage will be automatically **UNSEALED** and accessible to the public through controlled methods.  Once the body worn camera footage is unsealed, copies of the body worn camera footage may be requested exclusively in person with the **CLERK OF COURT**, who will provide physical copies of requested footage to the requester and assess an appropriate fee for the service, which must be paid before the copy is distributed.

Further, the pending *Motion for Leave to File Evidentiary Materials in Support of the Police Officer Defendants' Reply Brief Under Seal* (Doc. 93) is **DENIED**, subject to the delayed release and in conformity with the Court's decision above as to body worn camera footage that was filed under seal.

### C.   Factual Background[4]

---

[4] The facts presented in the "Factual Background" section of this Memorandum Opinion and Order are based on the factual allegations that are contained in the amended complaint (Doc. 43), which the Court must assume are true for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), *see,*

At all times relevant to the events of this action, Randall Adjessom ("Randall") resided at his family's home at 3408 Sheringham Drive, Mobile, Alabama ("the Sheringham Residence"). Doc. 73 at 2, 14. When Randall was shot and killed on November 13, 2023, he was sixteen (16) years old. *Id.* at 7, 19.

The Mobile Police Department ("MPD") became interested in the Sheringham Residence weeks before November 13, 2023, based on a citizen's complaint of suspected drug activity at the residence by Randall's older brother, Deangelo Adjessom ("Deangelo"), who was eighteen (18) years-old and became a suspect of an MPD Narcotics Unit investigation. *Id.* at 14. Deangelo did not reside at the Sheringham Residence. *Id.*

On November 9, 2023, the MPD initiated a traffic stop of Deangelo during which were discovered a small amount of marijuana, a firearm, and certain evidence that indicated an intent to distribute marijuana. *Id.* at 15. Deangelo cooperated during the traffic stop, waived his Miranda rights, and agreed to be interviewed. *Id.* Ultimately, Deangelo was released without an arrest. *Id.*

MPD then prepared a search warrant of the Sheringham Residence that a judge executed on November 9, 2023, at approximately 8:17 P.M. *Id.* The affidavit that was prepared to support the search warrant stated the MPD received from neighbors information about drug activity at the Sheringham Residence and, during the recent traffic stop of Deangelo, the MPD found marijuana, evidence of distribution, and a firearm. *Id.*

---

*e.g., United States v. Gaubert*, 499 U.S. 315, 327 (1991); *see also Cottone v. Jenne*, 326 F.3d 1352, 1355 & n.1 (11th Cir. 2003) ("Because we must accept the allegations of plaintiffs' amended complaint as true, what we set out in this opinion as 'the facts' for Rule 12(b)(6) purposes may not be the actual facts."), and the body worn camera footage that was submitted in support of the motion to dismiss, the content of which must prevail over any factual allegations that clearly conflict with the footage. *See Baker v. City of Madison*, 67 F.4th 1268, 1277-78 (11th Cir. 2023) (citations omitted).

Prior to the search warrant being executed, an MPD Narcotics Unit officer completed the MPD's Threat Assessment for Warrant Service form ("Threat Assessment Form") that is used to measure the risk of violence attendant to executing a warrant. *Id.* at 16. The MPD Narcotics Unit officer determined an eight (8) out of a possible ten (10) threat assessment, which allowed for the use of a SWAT[5] team as "optional." *Id.* The Threat Assessment Form included the question, "Are there children, elderly persons, or handicapped persons [inside of the location to be searched]?" The area for a response to the question on the Threat Assessment Form that is relevant to the events of this matter is permanently shaded out and contains the phrase "Informational purposes only." *Id.*

Prior to the November 13, 2023 raid on the Sheringham Residence, MPD conducted surveillance of the residence over several weeks. *Id.* at 17. Based on the threat assessment and receipt of the executed search warrant, the MPD Narcotics Unit engaged the MPD SWAT Unit to execute the warrant because of MPD officer shortages. *Id.*

On November 13, 2023, at approximately 5:37 A.M., the MPD SWAT Unit, comprised of police officer defendants Osviel Vigoa-Martinez, Scott Hank, Robert Davis, Daryl Gipson, Kyle Carag, Josh Evans, Steven Laster, Jonathan Myers, Blake Tillman, Steven Guidry, Brian Rivers, Christian Bryant, Jordan Soto, and Oliver Simpson (collectively, the "SWAT Defendants"), as well as the MPD Special Operations K9 handler Defendant Elizabeth Lowry ("Defendant Lowry"), began the predawn raid to execute the search warrant of the Sheringham Residence. *Id.* at 19. The

---

[5] "SWAT" is an acronym for "Special Weapons and Tactics team," which is "[a] designated law enforcement team whose members are recruited, selected, trained, equipped, and assigned to resolve critical incidents involving a threat to public safety which would otherwise exceed the capabilities of traditional law enforcement first responders and/or investigative units." *Tactical Response and Operations Standard for Law Enforcement Agencies*, National Tactical Officers Association (June 2023), https://ntoa.org/pdf/TROS.pdf.

warrant search scene was supported by the MPD Narcotics Unit, which was comprised of Defendants Charles DeGreer, Gerald Ripple, David Reyes, Jalon Robinson, Charles Hunter, Clinton Law, and Caitlyn Williams (collectively, the "Narcotics Unit Defendants"). *Id.* Sunrise on that day began at 6:16 A.M. *Id.*

At approximately 5:38 A.M., the SWAT team approached the Sheringham Residence from several different locations, while the Narcotics Unit provided support on scene. *Id.* At approximately 5:39 A.M., members of the SWAT team were gathered on, or near, the front porch of the Sheringham Residence to prepare to enter through the front door. Doc. 85-2. Other members of the SWAT team proceeded to the rear of the Sheringham Residence. Doc. 80-6. At approximately 5:39:47 A.M., a member of the SWAT team began to forcefully knock on the door of the Sheringham Residence, and announced, "Police! Search warrant!" and other members of the SWAT team echoed the same. Doc. 80-1. At approximately 5:39:50 A.M., Officer Laster, who carried a battering ram, struck the front door of the Sheringham Residence, which gave way, then members of the team quickly filed into the residence. *Id.* The front entrance of the Sheringham Residence opened to a set of stairs to the left that led to the second floor of the residence, a hallway straight ahead, and a living room to the right. Doc. 80-5. The SWAT team members were armed with rifles that had flashlights attachments. *Id.*

One of the first SWAT team members to enter the Sheringham Residence, Officer Gipson, encountered a startled woman[6] who stood immediately past the threshold of the living room then retreated, with her hands raised, into the living room, where another woman was located. *Id.* Officer Gipson directed the women, "Get on the ground," and repeated, "Hands!" and the women

---

[6] In Plaintiff's response to the instant motion to dismiss, she identifies the startled woman as Randall's grandmother, Soekebe Azigba, but that fact is not pled in the Second Amended Complaint.

complied and lay prone on the ground. *Id.* Officer Myers, who directly followed Officer Gipson into the Sheringham Residence, went left when he entered and halted at the base of the stairs, where he was soon joined by Officer Laster, who had a pistol drawn and pointed toward the top of the stairs. Doc. 80-2; Doc. 95-2.

Officer Tillman, who followed Officer Myers into the Sheringham Residence, was the first to proceed straight through the hallway. Doc. 85-1. While Officer Tillman proceeded to the end of the hallway, he had his weapon raised and the flashlight on, directed at the end of the hallway. *Id.* At the end of the hallway, there was a closed door off-center to the left, which led to a bathroom, an open door to the kitchen to the right, and the hallway continued to the left, which led to another room, straight ahead, and continued to the left. *Id.* As Officer Tillman neared the end of the hallway, his body worn camera footage shows a laser light shine at the bottom of the wall near the threshold of the room to the right. *Id.* Officer Tillman was positioned on the left side of the hallway and another SWAT team member, Officer Vigoa-Martinez, was on the right side of the hallway, slightly behind Officer Tillman. *Id.*

Randall then suddenly rounded the corner of the hallway where he was immediately met by the leading SWAT team members.[7] *Id.* Randall was first visible on Officer Tillman's body worn camera at approximately 5:39:59 A.M. *Id.* Randall then extended his left hand toward

---

[7] The body worn camera footage does not show how Randall initially wielded the handgun when he appeared from around the corner of the hallway due to the position of the cameras on the officers' bodies, visual obstructions from the officers' weapons that were wielded in the cameras' field of view, and the intensity of the light from the flashlights that washed out parts of the footage, which is not any sort of negative commentary by the Court but a recognition that the footage does not provide complete, unobscured coverage of the events that occurred. Ultimately, body worn camera footage provides an unbiased glimpse into certain events as they occurred, but a camera's wearer is, first and foremost, concerned with the task at hand, rather than the quality of the footage that is captured, especially given the circumstances that are presented during the events that occurred in this case.

Page 17 of 48

Officer Tillman and raised his right arm in which he held a handgun with a laser attachment. *Id.*; Doc. 80-1. Officer Tillman went backwards and into a seated position, while Officer Vigoa-Martinez fired several shots at Randall at close range and advanced around the corner. Doc. 85-2. Officer Tillman's weapon malfunctioned. Doc. 73 at 21. The first shot that was fired from Officer Vigoa-Martinez's weapon occurred at approximately 5:40:01 A.M. and the last shot was fired at approximately 5:40:02 A.M. Doc. 85-1. Randall fell backward in the direction from which he came and landed supine on the floor in the threshold of a bedroom. Doc. 85-2. Randall had been shot four times in his chest and torso. Doc. 73 at 21. The handgun landed on the ground, next to Randall's left torso, where he lay, with the muzzle pointed toward the wall on which the laser light from the handgun could be seen. Doc. 85-2. In the moments after Randall was shot, and as he lay on the ground, he moved his head over and tapped his chest a few times with his right hand, raised his right arm, and lifted up his head, slightly, then laid his right arm down above his head. *Id.* Randall continued to make small movements with his head and right foot, and again lifted his left arm. *Id.*

From the junction of the hallway, Officer Vigoa-Martinez faced the bedroom in front of which Randall lay and repeated, "Search Warrant!" and "Mobile Police!" Doc. 85-2. Officer Vigoa-Martinez reported Randall was "looking pretty rough" to which Officer Tillman responded, "It doesn't matter . . . we're not clear." Doc. 85-1; Doc. 85-2. Officer Vigoa-Martinez maintained his position and directed anyone in the bedroom to "come out." Doc. 85-2. Officer Vigoa-Martinez was then directed by Officer Tillman to clear the nearby bathroom, while Officers Tillman, Gipson, and Morris cleared the kitchen and its adjoining rooms, and were joined by three officers who initially went to the rear of the Sheringham Residence but remained outside when they heard the shots fired. Doc. 85-1; Doc. 85-2; Doc. 95-1; Doc. 95-3. After Officer Vigoa-

Page 18 of 48

Martinez cleared the bathroom, he positioned himself at the bathroom doorway and again announced, "Mobile Police Department!" and for anyone to "come out, now." Doc. 85-2. Officer Vigoa-Martinez coordinated with another officer to clear the remaining rooms of the hallway, where Randall lay. *Id.* Officer Vigoa-Martinez stated he would clear the room in front of which Randall lay then proceeded forward to inspect the room, accompanied by Officers Morris and Simpson. *Id.*; Doc. 95-1; Doc. 95-3. Officer Tillman and Officer Gipson proceeded to clear the room at the end of the hallway turn, beyond where Randall lay. Doc. 85-1.

Officer Bryant, the SWAT team medic, entered the Sheringham Residence as Officer Vigoa-Martinez fired at Randall. Doc. 80-3. As Officer Bryant entered the Sheringham Residence, he entered the room to the right of the entrance, and at approximately 5:40:50 A.M., he relayed an EMS unit was needed for "shots fired" but to whom that information was relayed is not determinable by the body worn camera footage. Doc. 80-3. Officer Bryant then grabbed his bag of medical equipment and fell behind the officers who were massed in the hallway. *Id.* When Officers Tillman, Vigoa-Martinez, Gipson, and Morris, and the other officers proceeded to clear the two rooms near where Randall lay, Officer Bryant followed behind. Doc. 80-3. At approximately 5:43:44 A.M., Officer Bryant stopped where Randall lay then knelt down near Randall's right torso. *Id.* Officer Bryant then began to administer medical aid. *Id.* Officer Vigoa-Martinez removed the handgun that lay next to Randall to a dresser in the room that he cleared then assisted Officer Bryant to roll Randall over on his left side for Officer Bryant to continue medical aid. *Id.*; Doc. 85-2. Officer Vigoa-Martinez then proceeded down the hallway and out the front door of the Sheringham Residence. Doc. 85-2. Meanwhile, Officer Bryant rolled Randall back into a supine position and continued medical aid. Doc. 80-3. Officer Simpson and another officer assisted Officer Bryant and responded to his instructions for assistance. *Id.*; Doc. 95-3.

Officer Bryant continued to administer medical aid to Randall. Doc. 80-3. At approximately 5:50:15 A.M., Officer Bryant stated Randall was not breathing well, and shortly thereafter, stated Randall needed to go somewhere else because there was only so much he could do alone. *Id.*

An ambulance crew stopped outside of the Sheringham Residence at approximately 5:54:21 A.M. and Officer Gipson proceeded to brief the crew of the situation. Doc. 80-5. The ambulance crew arrived in the hallway with a stretcher at approximately 5:55:50 A.M., a member of which began to administer medical aid to Randall. Doc. 80-3. Randall was then loaded onto the stretcher in the hallway then transported out of the Sheringham Residence by the ambulance crew. *Id.*

Randall was admitted to a local emergency room at approximately 6:28 A.M. where he was pronounced dead. Doc. 73-1.

While the SWAT team initially proceeded down the hallway and encountered Randall, Officers Myers and Laster remained at the base of the stairway to the second floor . Doc. 80-2; Doc. 95-2. A few seconds after the shots were fired at Randall, a woman appeared at the top of the stairway then put her hands up near her head. Doc. 80-2. Officer Laster motioned for the woman to come down the stairs, and she slowly proceeded toward the officers. *Id.* When she arrived at the bottom of the stairway, she was guided by Officer Bryant into the front room, across the hallway from the stairway, where the other two women were held. Doc. 80-3. One of the officers yelled, "Search warrant!" and "Mobile Police" toward the top of the stairway while they maintained their position at the base. Doc. 80-2. Approximately thirty (30) seconds after the first woman came down the stairway and was ushered away, three young women appeared at the top of the stairway then proceeded down and were ushered into the front room with the other women. *Id.* Officer Laster asked of the group of women if there was anyone else upstairs to which one of

them replied there was not. Doc. 95-2. Officer Guidry and another SWAT team member supervised the six women who were sat on the floor in the front room. Doc. 80-1. Officers Myers and Laster remained at the base of the stairs and, again, announced their presence and demanded anyone upstairs show themselves and come downstairs. Doc. 80-2. One of the older women, who identified herself as the owner of the Sheringham Residence[8], asked for the search warrant and Officer Guidry responded she would receive it "when they were done." Doc. 80-1. The same woman asked if she would be told anything to which she did not receive a response. *Id.*

Approximately four minutes and twenty seconds after the group of three women came down the stairs and were ushered away, Officers Myers, Morris, and Laster, and other SWAT team members proceeded up the stairway. Doc. 80-2; Doc. 95-1; Doc. 95-2. Officer Guidry was tasked to retrieve a protective shield from one of the vehicles that were parked outside, which he gave to Officer Laster. Doc. 80-1; Doc. 95-2. Officer Laster, holding the shield, led the group of officers up the stairway to the second floor, where they began to inspect and clear the rooms, as well as attic spaces. *Id.*

Meanwhile, Officer Guidry continued to supervise the women in the front room, which included Plaintiff, Randall's two minor sisters, his older sister, his aunt, and his grandmother. Doc. 73 at 14; Doc. 80-1. An officer announced the ambulance crew, when they arrived, needed to bring a stretcher, which caused one of the women to ask, "Who's hurt?" Doc. 80-1. Another officer closed the door to the front room with he, Officer Guidry, and the women inside, while the ambulance crew entered the Sheringham Residence then transported Randall via a stretcher. *Id.*;

---

[8] In Plaintiff's response to the instant motion to dismiss, she identifies herself as the woman who is the owner of the Sheringham Residence, but that fact is not pled in the Second Amended Complaint.

Doc. 80-3.  The women continued to be held in the front room after Randall was transported from the Sheringham Residence.  Doc. 80-1.  The women continued to be detained in the Sheringham Residence until that afternoon, and Plaintiff was kept in handcuffs.  Doc. 73 at 25, 52.  While the women were detained in the Sheringham Residence, the Police Officer Defendants searched the residence for evidence of a crime and searched Randall's cellphone without consent or a search warrant.  *Id.* at 25.  Deangelo, the target of the search warrant, was not present at the Sheringham Residence during the search.  Plaintiff was eventually transported in handcuffs from the Sheringham Residence to the MPD police station for questioning.  *Id.* at 51.

Plaintiff was not informed of Randall's death until the evening of November 13, 2023.  *Id.* at 26.

### III.    STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint on the basis that the plaintiff has failed to state a claim upon which relief may be granted.  *See* FED. R. CIV. P. 12(b)(6).  To survive a motion to dismiss, a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' [*Twombly*, 550 U.S.] at 570, 127 S. Ct. [at] 1955.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.* at 556, 127 S. Ct. [at] 1955.").  Since a Fed. R. Civ. P. 12(b)(6) motion questions the legal sufficiency of a complaint, in assessing the merits of the motion, the court must assume that all the factual allegations set forth in the complaint are true.  *See, e.g., Gaubert*, 499 U.S. at 327; *Powell v. Lennon*, 914 F.2d 1459, 1463 (11th Cir. 1990); *but*

*see also Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, all factual allegations shall be construed in the light most favorable to the plaintiff. *See, e.g., Brower v. County of Inyo*, 489 U.S. 593, 598 (1989). Obviously, therefore, a district court may not resolve factual disputes when adjudicating a motion to dismiss. *Page v. Postmaster Gen. and Chief Exec. Officer of the U.S. Postal Serv.,* 493 F. App'x 994, 995 (11th Cir. 2012)[9] (citing, among other cases, *Lawrence,* 919 F.2d at 1529, for the proposition that, under Fed. R. Civ. P. 12(b)(6), the existence of disputed material facts precludes a district court from granting a motion to dismiss). "When considering a motion to dismiss . . . the court limits its consideration to the pleadings and all exhibits attached thereto." *Thaeter v. Palm Beach Cnty. Sheriff's Office,* 449 F.3d 1342, 1352 (11th Cir. 2006) (quoting *Grossman v. Nationsbank, N.A.,* 225 F.3d 1228, 1231 (11th Cir. 2000)); *see also Reese v. Ellis, Painter, Ratterree & Adams, LLP,* 678 F.3d 1211, 1215-16 (11th Cir. 2012) ("Because the Ellis law firm's dunning letter and enclosed documents were attached to the Reeses' complaint as an exhibit, we treat them as part of the complaint for [Fed. R. Civ. P.] 12(b)(6) purposes.").

## IV.    DISCUSSION AND ANALYSIS

The Police Officer Defendants argue they are entitled to qualified immunity as to all of Plaintiff's § 1983 individual liability claims - Counts 2, 3, and 7 – because, at all times relevant to those claims, the Police Officer Defendants acted within their discretionary authority and Plaintiff,

---

[9] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

cannot show either a constitutional violation or a violation of clearly established law. The Police Officer Defendants also argue they are entitled to state-agent immunity as to Plaintiff's state-law claim of false imprisonment – Count 8 – because, at all times relevant to the claim, they acted within their discretionary authority and Plaintiff cannot demonstrate an exception to said immunity, either a violation of applicable law, or Plaintiff's constitutional rights, or the Police Officer Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law. *Id.* at 42-47. Finally, the Police Officer Defendants argue the Second Amended Complaint is an impermissible "shotgun pleading" because each count incorporates, and refers back, to all allegations of fact in all of the preceding paragraphs and Plaintiff does not specify to which of the Police Officer Defendants certain factual allegations apply. *Id.* at 47-52.

In response, Plaintiff argues the Police Officer Defendants are not entitled to qualified immunity because they acted outside of their discretionary authority and violated clearly established constitutional rights. Doc. 85 at 40-42. Plaintiff also argues the Police Officer Defendants are not entitled to state-agent immunity because she properly pled a claim for false imprisonment and the Police Officer Defendants did not exercise a discretionary function. *Id.* at 64-65.

As to whether the Police Officer Defendants acted within their discretionary authority, Plaintiff argues she does not challenge whether the Police Officer Defendants acted within their discretionary authority for their actions that occurred before Randall was shot but acted outside of their discretionary authority when they confined Randall's family members and withheld medical care from Randall to conceal an unconstitutional shooting, which was not performed for

investigative or legitimate legal purposes.[10] *Id.* at 42. Plaintiff argues this allegation is supported by the illegal search by the Police Officer Defendants of Randall's cellphone without a warrant or an articulable basis to do so and her transport to a police station for questioning by the Police Officer Defendants, even though she was not suspected of wrongdoing. *Id.*

As to whether the Police Officer Defendants violated clearly established constitutional rights, Plaintiff argues she has sufficiently pled constitutional claims for bystander liability, deliberate indifference to a serious medical need, and excessive force and unlawful detention. *Id.* at 43-63. Plaintiff argues she sufficiently pled a claim for bystander liability because the Police Officer Defendants failed to intervene in the use of excessive force against Randall after Officer Tillman's weapon malfunctioned and when they failed to properly knock, and announce, their presence before they proceeded to execute the search warrant . *Id.* at 43-49. Plaintiff argues she sufficiently pled a claim for deliberate indifference to a serious medical need because Randall had a right to medical aid, pursuant to the Fourteenth Amendment, and the Police Officer Defendants' delay of four minutes raises an inference of deliberate indifference, which is clearly established by *Wade v. Daniels*, 36 F4th 1318, 1326-27 (11th Cir. 2002). *Id.* at 49-55. Plaintiff argues she sufficiently pled a claim for excessive force and unlawful detention because the Police Officer Defendants kept Plaintiff and her family handcuffed and confined in the Sheringham Residence after the search warrant was completed, beyond constitutional limits, then transported them in handcuffs to MPD headquarters for interrogation without, at minimum, arguable cause. *Id.* at 57-63.

---

[10] However, Plaintiff states her decision to not challenge whether the Police Officer Defendants acted within their discretionary authority for their actions that occurred before Randall was shot is based on the facts alleged, and presently believed to be true, and reserves the right to reassert a challenge to such in a motion for summary judgment. Doc. 85 at 41 n.6.

As to whether, for purposes of state-agent immunity, Plaintiff sufficiently pled a claim for false imprisonment, Plaintiff echoes her arguments as to whether she sufficiently pled a claim for unlawful detention, she was detained beyond when the search warrant was completed then transported to MPD headquarters for interrogation without, at minimum, arguable cause. *Id.* at 63-64. Plaintiff argues the Police Officer Defendants did not exercise a discretionary function because, as she previously argued, she was detained beyond when the search warrant was completed then transported to MPD headquarters for interrogation without, at minimum, arguable cause. *Id.* at 64-65.

Finally, Plaintiff argues the Second Amended Complaint is not a "shotgun pleading" because it provides a detailed, chronological account of the relevant events, specifies the roles of particular officers in the events that occurred, and has included enough information for the Police Officer Defendants to meaningfully respond to the claims against them. *Id.* at 65-68. Further, Plaintiff argues, even if the Second Amended Complaint is considered to be a "shotgun pleading," dismissal with prejudice is unwarranted and she should be granted leave to replead since she has narrowed and clarified her claims as body worn camera footage has become available to review. *Id.* at 68-69.

The Court will, first, address the Police Officer Defendants' argument that they are entitled to qualified immunity as to all of Plaintiff's § 1983 individual liability claims, which are found in Counts 2, 3, and 7. The Court will then address, in turn, the Police Officer Defendants' arguments that they are entitled to state-agent immunity for Plaintiff's state-law claim of false imprisonment, which is found in Count 8, and the Second Amended Complaint is "shotgun pleading."

### A.  Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To be protected by qualified immunity, the government official must first demonstrate that he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred. *Garcia v. Casey*, 75 F.4th 1176, 1185 (11th Cir. 2023) (citing *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016)); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). "Once it has been determined that an official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is inappropriate." *Garcia*, 75 F.4th at 1185 (quotation omitted).

An officer acts within his discretionary authority when his behavior is "(1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018) (quoting *Harbert Int'l*, 157 F.3d at 1282); *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995). "Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (citation omitted). "In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017) (quoting *Holloman*, 370 F.3d at 1266). Therefore, an officer may still be acting within his discretionary authority even if/when violating the constitution. The relevant analysis is "whether the act

complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert Int'l v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) (citations and internal quotations omitted).

Courts utilize a two-part framework to evaluate whether qualified immunity applies to a claim. *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011). The first element is whether the plaintiff's allegations, if true, establish a constitutional violation. *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second element is whether the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id*. at 232. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Garcia*, 75 F.4th at 1185 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Wesby*, 583 U.S. at 63 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, (2011)). This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U. S. 335, 341 (1986). As to the second prong of the analysis, courts "recognize three sources of law that would put a government official on notice of statutory or constitutional rights: specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." *Goebert v. Lee County*, 510 F.3d 1312, 1330 (11th Cir. 2007). Courts will also look beyond caselaw to whether the case at hand is one of "obvious clarity" – i.e., where the officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law" on point. *Oliver v. Fiorino*, 586 F.3d 898, 907

(11th Cir. 2009) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002)).  In such situations where it is so obvious, courts have repeatedly held that the constitutional violation is clearly established even though there is no decision in a "materially similar preexisting case." *Cantu*, 974 F.3d at 1235 (citations and internal quotations omitted).  That said, "the clearly established law standard is a demanding one." *Id*. (citing *Wesby*, 583 U.S. at 63; *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600 (2015)).

The first inquiry may be a mixed question of law or fact, but the second inquiry is purely a question of law. *Hall v. Flournoy*, 975 F.3d 1269, 1275 (11th Cir. 2020).  "Both elements of this test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010) (generally citing *Pearson*, 555 U.S. 223).  If a plaintiff fails to establish either one, then the defendant is entitled to qualified immunity.

The Court will address whether the Police Officer Defendants are entitled to qualified immunity for each of Plaintiff's federal claims, in turn.

### 1.      Count 2 – Bystander Liability in Violation of the Fourth Amendment

The Court notes Plaintiff states she limits her claim of bystander liability from all of the Police Officer Defendants to Officers Tillman, Bryant, Guidry, Myers, Rivers, Gipson, Morris, Laster, Simpson, and Hanks.  Doc. 85 at 44 n.7.

#### a.      Discretionary Authority

In Plaintiff's response to the instant motion to dismiss, she states she does not challenge whether the Police Officer Defendants acted within their discretionary authority for their actions that occurred before Randall was shot (Doc. 85 at 41), which would encompass the events that comprise Plaintiff's bystander liability claim.

Regardless, Plaintiff alleges the Police Officer Defendants entered the Sheringham Residence to execute a search warrant.  Doc. 73 at 2, 19.  The Fourth Amendment states "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  Plaintiff does not challenge the validity of the search warrant that was executed, and it is undisputed the Police Officer Defendants acted within their discretionary authority when they executed the search warrant.

### b.    Constitutional Violation/Clearly Established

"An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Crenshaw v. Lister*, 556 F.3d 1283, 1293-94 (11th Cir. 2009) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008)).  "However, 'it must also be true that the non-intervening officer was in a position to intervene yet failed to do so.'"  *Id.* at 1294 (quoting *Hadley*, 526 at 1330). "One method of intervention is by verbally commanding or directing the other officer to stop using the force that is excessive."  *Jackson v. City of Atlanta*, 97 F.4th 1343, 1362 (11th Cir. 2024) (citing *Priester v. City of Rivera Beach*, 208 F.3d 919, 923-28 (11th Cir. 2000)).

In Plaintiff's bystander liability claim, she alleges the Police Officer Defendants had "sufficient time to act" and failed to intervene to protect Randall from Officer Vigoa-Martinez's use of force when "they did not call for restraint after a SWAT police officer's weapon malfunctioned and Randal began to retreat."  Doc. 73 at 39.  While Plaintiff argues in her response to the motion to dismiss there was also sufficient time for the Police Officer Defendants to intervene before their "unlawful and improper entry into the [Sheringham Residence]," (Doc. 85 at 45, 47-49), such conduct is not the basis of her claim in the Second Amended Complaint, so the

Page 30 of 48

Court will limit its consideration to whether the Police Officer Defendants failed to intervene to protect Randall from Officer Vigoa-Martinez's use of excessive force.

Here, according to the body worn camera footage, Officer Tillman first encountered Randall in the hallway at approximately 5:39:59 A.M., Officer Vigoa-Martinez first fired his weapon at approximately 5:40:01 A.M. and fired the final shot at 5:40:02 A.M., then ceased firing and held his position while he announced the presence of law enforcement officers. Doc. 85-1.

Both Plaintiff and the Police Officer Defendants cite to, and discuss, *Jackson*, 97 F.4th 1343, a case that was decided on a motion to dismiss in which the defense of qualified immunity was raised. Two officers approached a stopped vehicle inside of which was the driver and her fiancé, Jackson, in the passenger seat. *Id.* at 1347. One officer, Brandt, approached the driver-side and the other approached the passenger-side. *Id.* The officer who approached the passenger-side of the vehicle pointed a firearm at Jackson, ordered her to exit the vehicle, pulled her out of the vehicle and onto her knees, placed his arm around her neck, lifted her off the ground, body slammed her into the pavement, handcuffed her, then pushed her toward the officers' vehicle. *Id.* Jackson brought a claim for failure to intervene against Brandt, and on a motion to dismiss, the trial court denied that officer qualified immunity. *Id.* at 1347, 1349. On appeal, the Eleventh Circuit granted qualified immunity to Brandt as to Jackson's failure to intervene claim, and in doing so, noted, during the relevant events, his attention was engaged with the driver on the other side of the car and approximately nine seconds passed between when the other officer first made physical contact with Jackson then had her on the ground to be handcuffed. *Id.* at 1362-63. As to whether the officer had time to intervene in the use of force during that timeframe, the Eleventh Circuit stated:

> It would not be reasonable to require anyone to think and move that quickly in a difficult and fast-evolving situation that is fraught with uncertainty and peril. As

Page 31 of 48

we have emphasized before in reversing the denial of qualified immunity in an excessive force case, officers have to make rushed judgments "in circumstances that are tense, uncertain, and rapidly evolving." *Corbitt v. Vickers*, 929 F.3d 1304, 1321 (11th Cir. 2019) (quotation marks omitted). The law does not require perfection, much less the super-human perfection and speed that Jackson would have us demand of Brandt. Instead, as we explained in *Corbitt*, Fourth Amendment excessive force claims are "evaluated pursuant to a calculus that must embody allowance for the fact that police officers" are often forced to make quick decisions in difficult circumstances. *Id.* (alterations adopted) (quotation marks omitted). No binding authority requires officers to engage in extraordinary feats of action, reaction, speed, and movement. Clearly established law does not place that burden on Brandt. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1331 (11th Cir. 2008) (reversing denial of qualified immunity on failure to intervene claim against defendant officer who was in no position to "anticipate[ ] and then stop[ ]" his fellow officer's use of force). "[O]n-the-scene officers are often hampered by incomplete information and forced to make a split-second decision between action and inaction." *Davis v. City of Apopka*, 78 F.4th 1326, 1335 (11th Cir. 2023) (quotation marks omitted) (affirming dismissal of Fourth Amendment arrest claims). Reasonableness is required, and reasonableness is not perfection.

*Id.* at 1363.

In this case, Officer Vigoa-Martinez's use of force spanned, at most, two seconds before he ceased. During such a limited window, it would indeed have been an "extraordinary feat[ ] of action, reaction, speed, and movement," *id.*, for any of the Police Officer Defendants to have intervened in Officer Vigoa-Martinez's use of force, and Plaintiff has not identified clearly established law that would place such a burden on them under the circumstances that are presented in this matter. Therefore, the Court finds the Police Officer Defendants did not have a reasonable opportunity to intervene, physically or verbally, to stop Officer Vigoa-Martinez's use of force against Randall, even if they had a duty to intervene, and the Police Officer Defendants neither violated Plaintiff's Fourth Amendment rights nor her clearly established Fourth Amendment rights. Consequently, the Police Officer Defendants are entitled to qualified immunity as to Plaintiff's claim of bystander liability, and the motion to dismiss is **GRANTED** as to that claim.

**2.      Count 3 – Deliberate Indifference in Violation of the Fourteenth Amendment**

The Court notes Plaintiff states she limits her claim of deliberate indifference to a serious medical need from all of the Police Officer Defendants to Officers Tillman, Bryant, Guidry, Myers, Rivers, Gipson, Morris, Laster, Simpson, and Hanks.  Doc. 85 at 52 n.10.

**a.      Discretionary Authority**

In Plaintiff's deliberate indifference to a serious medical need claim, she alleges the Police Officer Defendants "improperly, unnecessarily, redundantly, intentionally, and in a haphazard, unprofessional state, devoted the entirety of the large officer presence on scene to securing the Sheringham Residence, while Randall was writhing on the floor in pain, actively bleeding to death," and in doing so "fail[ed] to immediately render aid to Randall and call for emergency medical services."  Doc 73 at 40-41.  However, the Police Officer Defendants entered the Sheringham Residence to execute a search warrant, the validity of which is not challenged and which the Court found to be within their discretionary authority.  Further, as part of the execution of the search warrant, the Police Officer Defendants secured the Sheringham Residence after Randall was shot, which is inarguably a legitimate job-related function and was performed within permissible means.  Plaintiff's argument that the Police Officer Defendants acted outside of their discretionary authority when they secured the Sheringham Residence, rather than immediately render medical aid to Randall, criticizes them for their actions that she alleges "were committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances," *Mikko*, 857 F.3d at 1144, and should not be considered to determine whether they acted within their discretionary authority.  Therefore, the Police Officer Defendants acted within their discretionary authority when they secured the Sheringham Residence after Randall was shot.

### b. Constitutional Violation/ Clearly Established

For Constitutional claims that are brought pursuant to § 1983 for the denial of proper medical care, a court applies different standards to the claim based on whether a plaintiff has been convicted of a crime when the medical care is required. *See Thomas v. Town of Davie*, 847 F.2d 771, 772 (11th Cir. 1988) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). If the plaintiff has not been convicted of a crime, "the relevant constitutional provision is the due process clause of the Fourteenth Amendment," which "require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by police." *Id.* (quoting *City of Revere*, 463 U.S. at 245-46). Federal jurisprudence classifies such plaintiffs, who have not been convicted of a crime but are apprehended by law enforcement officials, as pretrial detainees. *See id.* Since, at the time of the events that are alleged in the Second Amended Complaint, Randall had not been convicted of a crime, he is considered a pretrial detainee.

The Eleventh Circuit has held "the minimum standard for providing medical care to a pretrial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner," and "both the right to due process and the right to be free from cruel and unusual punishment are violated by a government official's deliberate indifference to serious medical needs." *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997) (citation omitted). Therefore, the Eleventh Circuit has relied upon decisions in both Eighth and Fourteenth Amendment cases to establish what constitutes "deliberate indifference." *Id.*

> The Fourteenth Amendment requires government officials to provide basic necessities, including medical care, to pretrial detainees. *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985). A failure to provide such care violates that amendment, which is actionable under [42 U.S.C.] § 1983. *Valderrama v.*

Page 34 of 48

*Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015). To prevail on such a claim, a litigant "must satisfy both an objective and a subjective inquiry." *Id.* (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)). The objective inquiry requires a plaintiff to establish the existence of an "objectively serious medical need." *Id.* The subjective inquiry requires a plaintiff to prove that a government official was "deliberatively indifferent" to that need. *Id.* We have synthesized this "deliberate indifference" inquiry into four elements: (1) the official "was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," (2) the official "actually drew that inference," (3) the official "disregarded the risk of serious harm," and (4) the official's "conduct amounted to more than gross negligence." *Id.* The mere fact that medical care is eventually provided is insufficient to defeat a claim for deliberate indifference. *Id.* An official may still act with deliberate indifference "by delaying the treatment of serious medical needs." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). But in making the determination of whether any particular delay is unconstitutional, the applicable court must consider "the reason for the delay and the nature of the medical need." *Id.*

*Ireland v. Prummell*, 53 F.4th 1274, 1287-88 (11th Cir. 2022) (internal footnotes omitted).

In Plaintiff's deliberate indifference to a serious medical need claim, she alleges Randall's gunshot wounds constituted a serious medical need, the Police Officer Defendants "acted with deliberate indifference to Randall's serious medical need by failing to immediately render aid to Randall and call for emergency medical services," the Police Officer Defendants "improperly, unnecessarily, redundantly, intentionally, and in a haphazard, unprofessional state, devoted the entirety of the large officer presence on scene to securing the Sheringham Residence" rather than provide medical aid to Randall, "more than four minutes after Randall was shot by [Officer] Vigoa-Martinez, at approximately 5:44:18 a.m., . . . [Officer] Bryant [began] to place bandages on Randall," the Police Officer Defendants "knew or should have known that this effort was insufficient to treat multiple gunshot wounds," the Police Officer Defendants "knew or should have known that it was necessary to contact emergency medical services so that Randall could receive appropriate gunshot wound treatment," the Police Officer Defendants "intentionally, knowingly, and/or willfully failed to timely contact emergency medical services or failed to permit

Page 35 of 48

emergency services from accessing the body," the Police Officer Defendants "were aware or should have been aware that a delay in appropriate gunshot would treatment would result in Randall's untimely death," and due to the Police Officer Defendants' delay, Randall was not admitted to a local emergency room . . . until 6:28 a.m., where he was pronounced dead." Doc. 73 at 40-42.

Here, the first shot was fired at Randall at approximately 5:40:01 A.M., and Officer Bryant (the SWAT team medic) began to administer medical aid to him at approximately 5:43:44 A.M., when he knelt beside him to begin. Doc. 80-3. In the meantime, the other Police Officer Defendants searched the Sheringham Residence. Officer Bryant was the only team member who provided direct medical aid to Randall, with some limited assistance from other team members, until the ambulance crew arrived on the scene. *Id.* Officer Bryant told other officers Randall required a higher level of care than he could provide, but it is not clear or alleged when an ambulance was, in fact, requested. *Id.* The ambulance arrived at the Sheringham Residence at approximately 5:54:21 A.M.

The Police Officer Defendants do not dispute Randall suffered from a serious medical need or they were aware of it. Doc. 79 at 28. The Police Officer Defendants, instead, dispute the third and fourth elements of Plaintiff's deliberate indifference claim, a disregard to the risk of serious harm and conduct that amounted to more than gross negligence. *Id.* at 29-33.

"[W]hen officers *intentionally* delay seeking treatment for a life-threatening injury, they act with deliberate indifference." *Daniels*, 36 F.4th 1318, 1326 (11th Cir. 2022) (quoting *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015)). "A jury can also infer deliberate indifference when an officer fails to justify or explain a delay in medical treatment." *Id.* (citing *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) and *Brown v. Hughes*, 894 F.2d 1533,

1538 (11th Cir. 1990)).

The Court finds Plaintiff has sufficiently pled a claim for deliberate indifference to a serious medical need and the Police Officer Defendants' arguments, despite the assistance of body worn camera footage, raise numerous factual issues that are inappropriate to resolve at this stage of the litigation. Such issues include whether it was reasonable, after the Police Officer Defendants encountered an armed person in the Sheringham Residence, for them to completely secure the residence before aid was rendered to Randall. Further, the Court cannot simply review the body worn camera footage and determine an appropriate level of medical care was administered to Randall, whether the delay in treatment for Randall was justified, and whether emergency medical services were appropriately contacted without delay, among other factual determinations. In sum, there are too many factual issues to determine for the parties to articulate whether clearly established law put the Police Officer Defendants on notice that their conduct violated Plaintiff's rights. Accordingly, the Police Officer Defendants' motion to dismiss Plaintiff's claim of deliberate indifference to a serious medical need is **DENIED**.

3. **Count 7 – Excessive Force and Unlawful Detention in Violation of the Fourth Amendment**

a. **Discretionary Authority**

Plaintiff alleges, as part of her claim of excessive force and unlawful detention, the Police Officer Defendants "unlawfully detained and seized [her], and thus deprived her of her constitutionally protected right to be free from the use of excessive force by forcing her to remain" in the front room of the Sheringham Residence and was transported in handcuffs to the MPD police station for questioning. Doc 73 at 51-52. As discussed, the Police Officer Defendants entered the Sheringham Residence to execute a search warrant, the validity of which is not challenged and which the Court found to be within their discretionary authority. Further, as part of the execution

Page 37 of 48

of the search warrant, the Police Officer Defendants detained Plaintiff in the front room of the Sheringham Residence.  The decision to detain Plaintiff in the front room while the search warrant was executed was undoubtedly an act of discretionary authority by the Police Officer Defendants as well as the decision to transport her to the MPD police station to question her.  Ultimately, Plaintiff criticizes the Police Officer Defendants for their actions that she alleges "were committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances," *Mikko*, 857 F.3d at 1144, and should not be considered to determine whether they acted within their discretionary authority.  Therefore, the Police Officer Defendants acted within their discretionary authority when they detained Plaintiff in the front room of the Sheringham Residence and transported her to the MPD police station to question her.

### b.    Constitutional Violation/Clearly Established

Plaintiff's excessive force and unlawful detention claim applies to her detention in the front room of the Sheringham Residence as well as her transport to the MPD police station for questioning.  The Court will outline the law that is applicable to her detention at the Sheringham Residence during the execution of the search warrant and the law that is applicable to her transport to the MPD police station for questioning then proceed with its analysis.

### i.    Applicable Law

#### (a)    Detention at the Sheringham Residence During the Execution of the Search Warrant

In *Muehler v. Mena*, 544 U.S. 93 (2005), the Supreme Court outlined the contours of a law enforcement officer's authority to detain the occupants of a premises while a proper search is conducted:

In *Michigan v. Summers*, 452 U.S. 692, 101 S. Ct. 2587, 69 L.Ed.2d 340 (1981),

Page 38 of 48

we held that officers executing a search warrant for contraband have the authority "to detain the occupants of the premises while a proper search is conducted." *Id.*, at 705, 101 S. Ct. 2587. Such detentions are appropriate, we explained, because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial. *Id.*, at 701–705, 101 S. Ct. 2587. We made clear that the detention of an occupant is "surely less intrusive than the search itself," and the presence of a warrant assures that a neutral magistrate has determined that probable cause exists to search the home. *Id.*, at 701, 101 S. Ct. 2587. Against this incremental intrusion, we posited three legitimate law enforcement interests that provide substantial justification for detaining an occupant: "preventing flight in the event that incriminating evidence is found"; "minimizing the risk of harm to the officers"; and facilitating "the orderly completion of the search," as detainees' "self-interest may induce them to open locked doors or locked containers to avoid the use of force." *Id.*, at 702–703, 101 S. Ct. 2587.

. . . . An officer's authority to detain incident to a search is categorical; it does not depend on the "quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Id.*, at 705, n.19, 101 S. Ct. 2587. . . .

Inherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention. *See Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it"). Indeed, *Summers* itself stressed that the risk of harm to officers and occupants is minimized "if the officers routinely exercise unquestioned command of the situation." 452 U.S., at 703, 101 S. Ct. 2587.

544 U.S. at 98-99.

Claims of excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard, judging the "'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene . . . ." *Graham* [ ], 490 U.S. at 395–96 [ ]. Generally, such claims require "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396, 109 S. Ct. 1865 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)) (internal quotation marks omitted). However, our Circuit has long declined to entertain claims of excessive force predicated upon the use of *de minimus* force by law enforcement. *See Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir.2000) ( "[T]he application of *de minimus* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."); *id.* at 1258 (holding that the *de minimus* force exception survived *Graham*).

*Croom v. Balkwill*, 645 F.3d 1240, 1251-52 (11th Cir. 2011).

**(b)      Transport to the MPD Police Station for Questioning**

*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), governs our inquiry into whether a suspect experienced only an investigatory stop or rather, an arrest.  Under *Terry*, we must evaluate "whether the stop went too far and matured into arrest before there was probable cause . . . ."  *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004).  We employ "four non-exclusive factors" to "more objectively draw[ ] the line between a *Terry* stop and an arrest in an individual case . . . ."  *Id.* at 1146.  Those factors include (1) "the law enforcement purposes served by the detention," (2) "the diligence with which the police pursue the investigation," (3) "the scope and intrusiveness of the detention," and (4) "the duration of the detention."  *Id.* (quoting *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) (per curiam)).

*Watkins v. Davis*, 156 F.4th 1084, 1106 (11th Cir. 2025).

"[T]ransportation to and investigative detention at the station house without probable cause or judicial authorization together violate the Fourth Amendment."  *Hayes v. Florida*, 470 U.S. 811, 815 (1985).  "[T]he line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes."  *Id.* at 1647.

"[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to ask whether a reasonable officer could conclude that there was a substantial chance of criminal activity."  *Washington v. Durand*, 25 F.4th 891, 902 (11th Cir. 2022) (quotation and internal modifications omitted).  "Although 'an arrest made without probable cause violates the Fourth Amendment,' an officer is entitled to qualified immunity if he has 'arguable probable cause.'"  *Badia*, 47 F.4th at 1181 (11th Cir. 2022) (quoting *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998)); *see also Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (also discussing that an officer need not have actual probable cause, but only arguable probable cause).

An officer has arguable probable cause if "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests."  [*District of Columbia v.* ]*Wesby*, 138 S. Ct. [577,] 593 [(2018)].  An officer lacks arguable probable cause only if "the state of the law on

Page 40 of 48

> the date of the alleged misconduct makes it obvious that the [officer's] acts violated the plaintiff's rights in the specific set of circumstances at issue." *Washington* [*v. Howard*], 25 F.4th [891,] 903 [(11th Cir. 2022)] (quotation omitted). Accordingly, "the dispositive question is whether it was already clearly established, as a matter of law, that at the time of Plaintiff's arrest, an objective officer could not have concluded reasonably that probable cause existed to arrest Plaintiff under the particular circumstances Defendants confronted." *Gates v. Khokhar*, 884 F.3d 1290, 1303 (11th Cir. 2018) (emphasis omitted).

*Garcia*, 75 F.4th at 1186.

### (ii)     Analysis

In Plaintiff's excessive force and unlawful detention claim, she alleges the Police Officer Defendants "unlawfully detained and seized [her], and thus deprived her of her constitutionally protected right to be free from the use of excessive force by forcing her to remain" in the front room of the Sheringham Residence and was transported in handcuffs to the MPD police station for questioning, she had not committed any crime and the Police Officer Defendants "did not have any reason whatsoever to suspect [she] had committed any crime," she did not "pose any threat" to the Police Officer Defendants, "her detention was unnecessary for the integrity of [ ] any ongoing criminal investigation," while she was detained at the Sheringham Residence, "at least one or more visibly armed Police Officer Defendants guarded the door to the room in which [she] was detained," and "[she] asked on numerous occasions why she and her family were being detained and received no response from Police Officer Defendants." Doc 73 at 51-53.

Here, Plaintiff has properly pled a claim for excessive force and unlawful detention. The body worn camera footage does not show when the search of the Sheringham Residence was complete, or when Plaintiff was transported to the MPD station for questioning and, therefore, does not contradict Plaintiff's allegations. And while the use of handcuffs for Plaintiff during the search, on balance, may have been reasonable during the search of the Sheringham Residence, once the search concluded, the calculus of the use of force changes. Further, based on Plaintiff's

allegations, there was not, at a minimum, arguable probable cause for the Police Officer Defendants to either continue to detain her in the front room of the Sheringham Residence after the search concluded or transport her to the MPD police station for questioning. The body worn camera footage does not provide such arguable probable cause, other than by speculation, and the inquiry into such is inappropriate at the motion to dismiss stage. Accordingly, the motion to dismiss Plaintiff's claim of excessive force and unlawful detention is **DENIED**.

**B.      State-Agent Immunity**

The Alabama Supreme Court stated the test for state-agent immunity as follows:

"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
(1) formulating plans, policies, or designs; or
(2) exercising his or her judgment in the administration of a department or agency of government, including but not limited to, examples such as:
            (a) making administrative adjudications;
            (b) allocating resources;
            (c) negotiating contracts;
            (d) hiring, firing, transferring, assigning, or supervising personnel; or
(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."

*Ex parte Butts*, 775 So. 2d 173, 177-78 (Ala. 2000) (emphasis omitted) (quoting *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000)); *see also* ALA. CODE § 36-1-12 (codifying the rule that governs State-agent immunity and is stated in *Ex parte Cranman*).

> [The Alabama Supreme Court] has established a "burden shifting" process when a party raises the defense of State-agent immunity. *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity. *Giambrone*, 874 So. 2d at 1052; *Ex parte Wood*, 852 So. 2d 705, 709 (Ala. 2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. *Giambrone*, 874 So. 2d at 1052; *Wood*, 852 So. 2d at 709; *Ex parte Davis*, 721 So. 2d 685, 689 (Ala. 1998). "A State agent acts beyond authority and is therefore not immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" *Giambrone*, 874 So. 2d at 1052 (quoting *Ex parte Butts*, 775 So. 2d [at] 178 [ ]).

*Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006).

### 1.        Count 8 – False Imprisonment

> "[F]or a detention to be valid, the officer must reasonably, and in good faith, suspect the individual detained of being involved in some form of criminality." *Walker,* 62 So.3d at 493 (quoting *Higgins,* 512 So.2d at 768). "Section 6–5–170, Ala. Code 1975, defines false imprisonment as 'the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty.'" *Walker,* 62 So.3d at 492. . . . "[P]robable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonable trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Walker,* 62 So.3d at 492 (internal quotation marks omitted).

*Ex parte Harris*, 216 So. 3d 1201, 1213 (Ala. 2016).

### a.        Discretionary Function

Plaintiff alleges, as part of her claim of false imprisonment, the Police Officer Defendants "restrained [her] through the exercise of excessive force and/or through their express and implied threat of force" and "forc[ed] her to go where she did not wish to go," in the front room of the Sheringham Residence and the MPD police station, and "acted without probable cause to detain

Page 43 of 48

[her]." Doc 73 at 55.

The Police Officer Defendants do not explicitly state which discretionary function they performed that entitles them to state-agent immunity, but given they assert immunity from Plaintiff's claim of false imprisonment, the Court assumes, for purposes of the motion to dismiss, they "exercise[ed] judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons." *Ex parte Butts*, 775 So. 2d 173, 177-78

Under Alabama law, "a wrongful or false arrest will also support a claim for false imprisonment." *Upshaw v. McArdle*, 650 So. 2d 875, 878 (Ala. 1994). Whether an arrest is lawful determines whether a law enforcement officer performed a discretionary function that would entitle that officer to state-agent immunity. *See Telfare v. City of Huntsville*, 841 So. 2d 1222, 1229 (Ala. 2002) ("Because there is no evidence in the record tending to show that Officer McCarver was pursuing a discretionary function, i.e., was effectuating a lawful arrest, the City has failed to demonstrate that it is entitled to immunity."). In the same way, if Plaintiff's detention at the Sheringham Residence after the warrant search was concluded, and her transport to the MPD police station for questioning, are not supported by probable cause, then the Police Officer Defendants have not discharged their burden to show they are entitled to state-agent immunity.

### b.    Probable Cause or Arguable Probable Cause

As the Court discussed in the context of Plaintiff's excessive force and unlawful detention claim, based on Plaintiff's allegations, there was not, at a minimum, arguable probable cause for the Police Officer Defendants to either continue to detain her in the front room of the Sheringham Residence after the search concluded or transport her to the MPD police station for questioning. The body worn camera footage does not provide such arguable probable cause, other than by

Page 44 of 48

speculation, and the inquiry into such is inappropriate at the motion to dismiss stage.  Accordingly, the motion to dismiss Plaintiff's claim of false imprisonment is **DENIED**.

## C.   **"Shotgun Pleading"**

Fed. R. Civ. P. 8 provides a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  Each allegation in the complaint "must be simple, concise, and direct."  FED. R. CIV. P. 8(d)(1).  Fed. R. Civ. P. 10 provides that the complaint must "state [the plaintiff's] claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances."  FED. R. CIV. P. 10(b).

> The purpose of [Rule 8(a)(2) and Rule 10(b)] is self-evident, to require the pleader to present his claims discretely and succinctly, so that [ ] his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not.

*Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015) (quoting *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1544 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting)); *see also Twombly*, 550 U.S. at 555 (holding that the purpose of Fed. R. Civ. P. 8(a)(2) is to "give the defendant fair notice of what the claim is and the grounds upon which it rests." (citation, internal quotation marks, and ellipsis omitted)).

"Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings,'" and have been uniformly rejected by the Eleventh Circuit.  *Weiland*, 792 F.3d at 1320.  "Shotgun pleadings violate Rule 8(a)(2)'s 'short and plain statement' requirement by 'failing . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.'"  *McDonough v. City of Homestead*, 771 F. App'x 952, 955 (11th Cir. 2019) (quoting *Vibe Macro, Inc. v. Shabanets*, 878 F.3d 1291, 1294-95 (11th Cir. 2018).  Put another way, it is "[t]he failure to identify claims with sufficient clarity to enable the

defendant to frame a responsive pleading[.]" *Beckwith v. Bellsouth Telecomms. Inc.*, 146 F. App'x 368, 371 (11th Cir. 2005). There are four types of shotgun pleadings: (1) pleadings that "contain[] multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint;" (2) pleadings that are "guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" (3) pleadings that "commit[ ] the sin of not separating into a different count each cause of action or claim for relief;" and (4) pleadings that commit "the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Weiland*, 792 F.3d at 1321.

While the complaint does contain multiple counts where each count adopts the allegations of all of the preceding counts and groups defendants for claims, the Court finds Plaintiff's claims are sufficiently clear for the Police Officer Defendants to address. Any lingering issues can be resolved by normal discovery mechanisms, and indeed, Plaintiff in her response to the instant motion to dismiss has narrowed the defendants against whom she brings certain claims based on body worn camera footage that has been produced in evidence. Accordingly, the motion to dismiss Plaintiff's Second Amended Complaint because it is a "shotgun pleading" is **DENIED**.[11]

## V.    CONCLUSION

Based on the above, it is hereby **ORDERED**:

1.    The Police Officer Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 78) is **GRANTED in part and DENIED in part**. The motion is **GRANTED** as to Plaintiff's claim of bystander liability (Count II) that is brought against Defendants Scott

---

[11] For any future amendments to the complaint, Plaintiff should avoid such pleading deficiencies.

Page 46 of 48

Hanks, Robert Davis, Daryl Gipson, Kyle Carag, Philip Morris, Josh Evans, Steven Laster, Jonathan Myers, Blake Tillman, Steven Guidry, Brian Rivers, Christian Bryant, Jordan Soto, Oliver Simpson, and Elizabeth Lowry, because they are entitled to qualified immunity. The motion is, otherwise, **DENIED**.

2.      The body worn camera footage (Docs. 80-1 through -6, 85-1 through -3, 95-1 through -3) that was filed in support of the instant motion to dismiss, and its response and reply, will remain **PROVISIONALLY SEALED** for forty (40) days after this Memorandum Opinion and Order is entered. If an appeal of this Memorandum Opinion and Order is not timely filed and a request to seal the aforementioned body worn camera footage is not filed with the appellate court, the body worn camera footage will be **UNSEALED** and accessible to the public through controlled methods. Once the body worn camera footage is unsealed, copies of the body worn camera footage may be requested exclusively in person with the **CLERK OF COURT**, who will provide physical copies of requested footage to the requester and assess an appropriate fee for the service, which must be paid before the copy is distributed.

3.      The Motion for Leave to File Evidentiary Materials in Support of the Police Officer Defendants' Reply Brief Under Seal (Doc. 93) is **DENIED**, in conformity with the Court's decision above as to body worn camera footage that was filed under seal. The relevant body worn camera footage (Docs. 95-1 through -3) will be **UNSEALED** forty (40) days after this Memorandum Opinion and Order is entered unless an appeal of this Memorandum Opinion and Order is timely filed and a request to seal the aforementioned body worn camera footage is filed with the appellate court.

**DONE** and **ORDERED** this 28th day of July 2026.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE